Jeffrey M. BROWN and Jeffrey M. Brown Associates, Inc., Plaintiffs–Appellants,

v.

Charles CARA and Tracto Equipment, Corp., Defendants–Appellees.

Docket No. 04–5968–CV.

United States Court of Appeals, Second Circuit.

Argued: July 13, 2005.

Decided: July 28, 2005.

Steven Barshov, Sive, Paget & Riesel (Steven C. Russo and Suzanne Joyce, on the brief), New York, NY, for Plaintiffs–Appellants.

Donald F. Schneider, Schneider Goldstein Bloomfield LLP, New York, NY, for Defendants–Appellees.

Before: STRAUB and SACK, Circuit Judges, KRAVITZ, District Judge.[*]

STRAUB, Circuit Judge.

Plaintiffs appeal from a partial grant of summary judgment, dismissing all claims against Defendant–Appellee Tracto Equipment, Corp., and all contract claims against Defendant–Appellee Charles Cara. We hold that the grant of summary judgment as to Tracto was premature and

---

[*] The Hon. Mark R. Kravitz, United States District Judge, District of Connecticut, sitting by designation.

therefore vacate that portion of the District Court Order. We further hold that, while the preliminary agreement is not enforceable as to the ultimate contractual goal contemplated in the document, it is enforceable as an obligation between the parties to negotiate in good faith within the framework of the agreement. We therefore affirm, in part, reverse, in part, and vacate, in part, the District Court's grant of summary judgment to defendants as to plaintiffs' contract claims. Because significant issues of fact persist, we remand to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff–Appellant Jeffrey M. Brown ("Brown"), a citizen and resident of Pennsylvania, is CEO of Plaintiff–Appellant Jeffrey M. Brown Associates, Inc. (collectively "JMB"), a development and construction contractor with its principal place of business in Pennsylvania. Defendant–Appellee Charles Cara ("Cara"), a citizen and resident of New York, is owner and President of Defendant–Appellee Tracto Equipment, Corp. ("Tracto"), a New York corporation with its principal place of business in New York. During all times relevant to this appeal Tracto owned a parcel of land located at 100 Jay Street, Brooklyn, New York ("Jay Street Property" or the "Property").

In March 2000 the Jay Street Property was in use as a parking lot and was subject to zoning limitations that made it unsuitable for substantial commercial or residential development. At some time prior to March 2000, JMB and Cara together contemplated developing the Jay Street Property for commercial and residential use. The discussions that followed culminated in a two-page Memorandum of Understanding ("MOU"), signed by Brown for "Jeffrey M. Brown Associates, Inc., and

his companies, entities, etc.," and by Cara for "Charles Cara and his companies, entities, etc.," on March 27, 2000, by which the parties agreed to "work together to develop, build, market and manage a new real estate venture planned for an existing site at 100 Jay Street in Brooklyn, NY" ("Jay Street Project" or the "Project").

The MOU, referring to prior meetings between the parties, sets forth a general working framework for the Project, including basic design parameters and provisions for the division and distribution of future proceeds. According to the stated terms, Cara is to "provide[ ] the property at no cost to the partnership (or whatever combined entity is formed in the future to develop the project)." Brown is to "provide[ ] his company and individual experience, lender relationships, architect/engineering relationships, legal relationships and governmental relationships to lead the development effort ... [including] the rezoning process, conceptual design of the project, conceptual budgeting, arranging for possible financing avenues and helping to establish an effective marketing plan." The MOU sets forth Cara's responsibility for compensating a named consultant and Brown's responsibility to compensate another named consultant. It provides that "Brown will build the project with union labor, if needed," and establishes that "Cara will act in the capacity of an Owner's representative on the project." "Brown agrees to front the costs of development up to an amount not exceeding $175,000," and the parties agree to pursue jointly the provision of necessary financing. Finally, the MOU declares that "time is of the essence," and states the parties' intent to "enter into a formal contract shortly."

In a letter dated April 5, 2000, and addressed to Brown, Cara states his desire to negotiate final terms of the partnership,

design, and project financing. None of the proposed terms were settled, however, allegedly because the parties agreed that the costs associated with the negotiations would be wasted if the Property was not suitably rezoned.

Consistent with the terms outlined in the MOU, JMB commissioned the design of a multi-use, two-tower, building, which came to be known as the "Light Bridges at Jay Street." JMB subsequently sought, through a process of applications, publicity, community meetings, lobbying, and presentations to community boards, rezoning of the Property to allow construction of the Light Bridges Project. Cara was aware of these efforts and attended some of the meetings. In November and December 2001, the Project received the needed approvals.

Ready to move forward, the parties attempted to negotiate the necessary corporate, financing, construction, and operating agreements. Negotiations proceeded through 2002 and into 2003. During the spring of 2003, Cara requested from JMB a proposed construction management agreement. JMB complied, but Cara was not pleased with the terms described in that document. JMB claims that the wrong document was sent to Cara and that JMB so informed Cara at the time. However, Cara's displeasure and offense were so deep that he refused to continue with negotiations and ceased all communication and collaboration with JMB.

In June 2003 JMB brought this diversity action seeking declaratory judgment, a permanent injunction, specific performance of the MOU, and, in the alternative, damages in *quantum meruit.* Defendants moved for summary judgment on August 11, 2003. Plaintiffs cross-moved for summary judgment on September 12, 2003. The motions were referred to Magistrate Judge Cheryl L. Pollak who, on May 19,

2004, issued a lengthy and detailed report and recommendation concluding that summary judgment should be granted in favor of defendants as to plaintiffs' first and second causes of action seeking enforcement of the MOU. Magistrate Judge Pollak also recommended dismissing all claims against Tracto. The Report further recommended that the parties proceed to discovery on the remaining claims.

The parties filed timely objections to the Report and Recommendation. On September 30, 2004, and November 9, 2004, the District Court, Sterling Johnson, Jr., *Judge,* issued brief orders, adopting in substance the recommendations of Magistrate Judge Pollak. The District Court dismissed all causes of action against Tracto and all causes of action against Cara, save plaintiffs' claim for relief in *quantum meruit* against Cara. JMB subsequently filed a motion for entry of final judgment pursuant to Rule 54(b), Fed.R.Civ.P. The unopposed motion was granted; and JMB filed a timely notice of appeal. We assert jurisdiction under 28 U.S.C. § 1291, affirm, in part, reverse, in part, vacate, in part, and remand.

## DISCUSSION

■ Neither party disputes that New York law applies in this diversity case. In reviewing the District Court's grant of summary judgment we apply *de novo* the standards of decision for Rule 56, Fed. R.Civ.P., motions. We will affirm the District Court's grant of summary judgment to defendants only if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law. *Taggart v. Time Inc.,* 924 F.2d 43, 45–46 (2d Cir.1991). Because this case involves enforcement of an alleged contract, the intentions of the parties are at issue. While this is frequently a source of

persistent disputes of fact, "[w]here a question of intention is determinable by written agreements, the question is one of law, appropriately decided on a motion for summary judgment." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989) (internal quotation marks, alteration, and citation omitted). Applying these standards, we affirm, in part, reverse, in part, vacate, in part, and remand.

## I. *Enforceability of the MOU.*

■ The first question presented on appeal is whether the MOU is an enforceable preliminary agreement. *See Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998); *Arcadian*, 884 F.2d at 72–73; *Teachers Ins. & Annuity Ass'n. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). The District Court found that it is not. We agree that the MOU does not bind the parties to complete the Jay Street Project but disagree insofar as the District Court found that the MOU does not bind the parties to negotiate in good faith open terms that must be settled in order for the development to proceed within the framework described by the MOU.

■ "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite*, 145 F.3d at 548. There is no dispute that this is the situation here. At the signing of the MOU, JMB and Cara knew that further negotiations would be required. The MOU itself contemplates a "formal contract" to be en-

tered into in the future. Further, only days after the MOU was signed, Cara solicited JMB to enter negotiations toward the execution of significant and necessary agreements, demonstrating the parties' contemporary understanding that, though they had signed the MOU, further negotiations and formal agreements were necessary.

"In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite*, 145 F.3d at 548. The extent of the obligations created depend on the preliminary agreement in question, though, in general, "binding preliminary agreements fall into one of two categories." *Id.* These two types are most authoritatively described in *Tribune*, where Judge Leval, collecting the relevant New York law, describes "Type I" preliminary agreements as "complete," reflecting a meeting of the minds on "all the issues perceived to require negotiation." 670 F.Supp. at 498. Because it is complete, a Type I preliminary agreement "binds both sides to their ultimate contractual objective." *Adjustrite*, 145 F.3d at 548. "Type II" preliminary agreements, by contrast, are "binding only to a certain degree," reflecting agreement "on certain major terms, but leav[ing] other terms open for further negotiation." *Id.* Type II agreements "do[ ] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Id.* (internal quotation marks and alteration omitted).[1]

---

1. Defendants express some doubts as to whether Type II agreements exist in New York law, or are merely a "creature of the federal courts." *Simone v. N.V. Floresta*, 1999 WL 429504, at *9 n. 3 (S.D.N.Y. June 18, 1999), 1999 U.S. Dist. LEXIS 9578, at *27 n. 3. However, New York courts have cited

with approval *Tribune* and *Adjustrite*, and appear to recognize the possibility of "Type II" preliminary agreements. *See, e.g., SNC, Ltd. v. Kamine Eng. and Mech. Contracting Co., Inc.*, 238 A.D.2d 146, 655 N.Y.S.2d 47, 48 (1997); *River Glen Assoc., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 743

*A. The MOU is not a binding "Type I" preliminary agreement.*

■ The District Court, adopting Magistrate Judge Pollak's recommendation, found that the MOU is not a "Type I" preliminary agreement. We agree. The hallmark of a Type I agreement is that the parties have agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced. *Adjustrite*, 145 F.3d at 548. However, " '[t]here is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.' " *Arcadian*, 884 F.2d at 73 (quoting *Tribune*, 670 F.Supp. at 499); *see also Carmon v. Soleh Boneh Ltd.*, 206 A.D.2d 450, 614 N.Y.S.2d 555, 556 (1994) ("[W]here an agreement contains open terms, calls for future approval, and expressly anticipates future preparation and execution of contract documents, there is a strong presumption against finding a binding and enforceable obligation."). The category of Type I preliminary agreements is, then, limited to agreements that are "preliminary" in name only. *Adjustrite*, 145 F.3d at 548.

■ There are four factors relevant to determining whether a preliminary agreement is enforceable as to the "ultimate contractual objective":

(1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;

(2) whether there has been partial performance of the contract;

(3) whether all of the terms of the alleged contract have been agreed upon; and

(4) whether the agreement at issue is the type of contract that is usually committed to writing.

*See Adjustrite*, 145 F.3d at 549.

■ The first factor, which is frequently the most important, requires the Court to determine whether the language of the contract discloses an intention by the parties to be bound to the ultimate objective. *Adjustrite*, 145 F.3d at 549. This factor is frequently determined by explicit language of commitment or reservation. However, the "fact that [a] preliminary agreement contains no express reservation of the right not to be bound is not dispositive of whether it is binding [because] a reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing." WILLISTON ON CONTRACTS, § 4:8. Where there is no language that may be read to bind the parties to the ultimate goal, an explicit reservation would serve no purpose.

There is no explicit reservation in the MOU. Rather, the language is decidedly non-committal, suggesting, at most, a promise to "work together." As plaintiffs admit, all of the critical design, business, construction, and financing details were utterly contingent upon the rezoning. In comprehension of this uncertainty, the language of the MOU is scrupulously reserved. For example, rather than committing the parties "to develop, build, market, and manage the Light Bridges of Jay Street," the MOU only purports to "outline the terms under which [the parties] will *work together* to develop, build, market, and manage a new real estate venture" (emphasis added). The MOU goes on to

---

N.Y.S.2d 870 (2002) (holding that agreement did not constitute a "binding preliminary

agreement to negotiate in good faith" a mortgage contract).

foretell entrance "into a formal contract," and concludes by stating that the parties "agree to work together." Because the language is so non-committal, the absence of an expressed reservation is of little significance, particularly in view of the MOU's statement that a formal contract is forthcoming.

Plaintiffs may argue that language more precise and strong was not suitable to the circumstances, given that all the final terms were contingent upon eventual rezoning. While true, this adds no weight to the claim that the MOU is a Type I agreement. To the contrary, it suggests that, given the circumstances, the most the parties could hope to achieve in the MOU was a commitment to negotiate in good faith additional terms, within the framework provided in the agreement, as conditions evolved.

There can be no serious dispute that the second factor weighs heavily in favor of plaintiffs. JMB expended significant time and energy to design the Project and to clear a number of political and regulatory hurdles. Cara was contemporaneously aware of this performance and, on some occasions at least, was present for presentations conducted by JMB before various boards and citizen groups. These efforts bore fruit and constitute significant partial performance by JMB, which was accepted by Cara and has resulted in significant benefits accruing to the Property.

The third factor, by contrast, falls in favor of defendants. No credible case can be made that the MOU documents a "complete agreement ... on all the issues perceived to require negotiation." *Tribune*, 670 F.Supp. at 498; *see also Adjustrite*, 145 F.3d at 548. To the contrary, the MOU reaches almost *none* of the terms of the Light Bridges Project that require negotiation. For example, the MOU is silent on critical terms of design, financing, construction, compensation, corporate form, and ownership. The several-years-long process of negotiation that followed the rezoning is ample evidence that much is missing from the MOU.

JMB argues that, given the circumstances, this level of detail was impossible to achieve when the MOU was signed. Assuming this to be true does not make the MOU a more binding contract, however. Moreover, we are not convinced that, had they so desired, the parties could not have negotiated a fully binding contract regardless of the unknown. Contracting parties faced with similar uncertainty routinely negotiate objective methodologies by which open terms are later to be determined. *See, e.g., Carmon*, 614 N.Y.S.2d at 556 ("It is well settled that an agreement to agree, in which material terms are left for future negotiations, is unenforceable unless a methodology for determining the material terms can be found within the four corners of the agreement or the agreement refers to an objective extrinsic event, condition, or standard by which material terms may be determined."). JMB may claim that such an exercise would have been pointless until the rezoning process was completed. Of course, that says no more than that JMB, rather than expending the resources necessary to achieve a fully-binding agreement, decided to assume the risk that the parties would not, in the end, be able to "work together."

The fourth factor also weighs in favor of defendants. New York courts have recognized that the "complexity and duration of [an] alleged agreement" is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable. *See Warwick Assocs. v. FAI Ins. Ltd.*, 275 A.D.2d 653, 713 N.Y.S.2d 178 (2000). As contemplated by the parties, the Light Bridges is a project of enormous complexity that would likely

span decades were it pursued to completion. All parties admit that the two-page MOU is not sufficient to the task of developing and managing the final Project.

On appeal JMB relies heavily upon our opinion in *SCS Communications, Inc., v. Herrick Co., Inc.*, 360 F.3d 329 (2d. Cir. 2004). That reliance is misplaced. In *SCS* we were confronted with a preliminary letter agreement that contemplated the formation of a partnership, composed of Herrick, SCS, and TOG Acquisition Co., that would purchase non-party Orleander Group. The letter agreement wanted for specificity and contained language suggesting that the parties did not mean to be bound to the final acquisition. However, the letter also included an agreement that none of the parties to the letter, or their affiliates, would acquire Orleander "without complying with the terms of this letter." *Id.* at 340.

Despite this agreement, SCS and TOG eventually cut Herrick out of the deal and acquired Orleander on their own. Herrick sued, seeking enforcement of the agreement by the parties to acquire Orleander together or not at all. After expressing significant doubt as to the enforceability of the letter as a contract *to acquire* Orleander, we found that the agreement of the parties to acquire Orleander *together or not at all* was independently enforceable.

The MOU in this case does not contain an equivalent independent term committing the parties to develop the Jay Street Property together or not at all. Absent such a clause, *SCS* provides plaintiff no succor.

For these reasons, we agree with the District Court and hold that the MOU is not a binding Type I preliminary agreement. We affirm the judgment of the District Court to the extent that it is consistent with this holding.

## B. The MOU is a binding "Type II" preliminary agreement.

■ We agree with the lower courts that the MOU is not a binding Type I preliminary agreement. We hold, however, that the intention of the parties to create a "Type II" preliminary agreement is patent in the language of the MOU, presenting us with a pure issue of law. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989). We reverse the judgment of the District Court to the extent that it finds to the contrary.[2]

In *Tribune*, Judge Leval identified two core, but often competing, policy concerns relevant to preliminary agreements. The first is to "avoid trapping parties in surprise contractual obligations that they nev-

**2.** Defendants argue on appeal that plaintiffs waived in the lower courts claims based on a theory that the MOU is a "Type II" agreement. This argument is without merit. Plaintiffs' first cause of action in the First Amended Complaint alleges that, by negotiating in good faith remaining contract terms, JMB performed its obligations under the MOU and is entitled to declaratory judgment. The second cause of action claims that defendants "breached the MOU ... by [*inter alia*] failing and refusing to negotiate in good faith." On their cross-motion for summary judgment, plaintiffs argued that "[t]he MOU is, at the absolute bare minimum, a so called 'Type II' preliminary agreement that required

defendants to negotiate in good faith regarding any open issues." Plaintiffs' Memorandum of Law in Support of Cross–Motion for Partial Summary Judgment at 30 n. 5. In their objections to Magistrate Judge Pollak's Report and Recommendation plaintiffs again argued that the MOU is, at minimum, a Type II preliminary agreement. Based on this record there is no plausible ground upon which to argue that JMB waived claims based on the theory that the MOU is a Type II preliminary agreement. Defendants may argue that the courts below failed to address squarely the Type II claim, but blame and prejudice cannot lie with JMB for those omissions.

er intended." 670 F.Supp. at 497; *Adjustrite,* 145 F.3d at 548. The second is the "enforce[ment] and perserv[ation of] agreements that were intended as binding, despite a need for further documentation or further negotiation." 670 F.Supp. at 498; *Adjustrite,* 145 F.3d at 548. The path between this Scylla and Charybdis is, of course, to enforce a preliminary agreement only to the extent that the parties intend it to be binding. In this regard, "giving legal recognition to [Type II agreements] serves a valuable function in the marketplace ... permit[ting parties] to make plans in reliance upon their preliminary agreements and present market conditions ... [without] expend[ing] enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms." *Tribune,* 670 F.Supp. at 499. In our view, this is exactly what these parties did when they signed the MOU.

■ This flexibility comes with limitations, of course. While a Type I preliminary agreement is fully binding as to the final contractual goal, a Type II agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Adjustrite,* 145 F.3d at 548 (internal quotation marks omitted). "This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract." *Tribune,* 670 F.Supp. at 498. Whether the differences that have terminated the parties' working relationship in this case reflect good faith is a question for the District Court on remand.

■ The considerations relevant to whether a preliminary agreement is a binding Type II agreement are:

(1) whether the intent to be bound is revealed by the language of the agreement;

(2) the context of the negotiations;

(3) the existence of open terms;

(4) partial performance; and

(5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*See Arcadian,* 884 F.2d at 72; WILLISTON ON CONTRACTS, § 4:8.

While some of these factors are the same as those applied to determine whether a document is a Type I preliminary agreement, they "have a somewhat different significance where ... the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms." *Tribune,* 670 F.Supp. at 499. More to the point, if the question posed is whether the parties have agreed to proceed within an open framework toward a contractual goal, leaving necessary terms for later negotiation, rather than whether the parties have agreed to achieve the ultimate contractual goal, then the language of the agreement, its contents and omissions, and the context in which it was negotiated and signed, may lead to different conclusions.

The essence of a Type II preliminary agreement is that it creates an "obligation to negotiate the open issues in good faith in an attempt to reach the [ultimate contractual objective] within the agreed framework." *Tribune,* 670 F.Supp. at 498; *see also Adjustrite,* 145 F.3d at 548. Measuring the MOU by the relevant factors in light of this limited contractual goal it is clear that it is a binding preliminary agreement to work toward the goal of developing the Jay Street Property within

a defined framework, preserving for later negotiation in good faith business, design, financing, construction, and management terms necessary to achieve the ultimate goal of developing and exploiting the Jay Street Property.

As to the first factor, while the MOU does not disclose an intention by the parties to be bound to the ultimate goal of the contract, it clearly states the parties' agreement to "work together to develop, build, market, and manage [the Jay Street Property]" and to "work together in accordance with the terms and conditions outlined [in the MOU]." We cannot imagine more clear evidence of an intention to be bound to the MOU as a general framework in which the parties will proceed in good faith toward the goal of developing the Property while preserving for later negotiation the specific details of necessary business, design, construction, financing, and management terms.

The second factor also supports a finding that the MOU is a binding Type II agreement. As the parties agree, at the time the MOU was signed, the Jay Street Project was subject to numerous contingencies that had the potential to dramatically affect planning, execution, and management. It was in this context that the parties elected to negotiate a general framework within which they could proceed while preserving flexibility in the face of future uncertainty. While it was possible in the abstract to negotiate a more definitive contract, using determinative methodologies to be applied to open issues, the context of the negotiations did not require derivation of such algorithms if the parties opted instead for a more open arrangement. The MOU is evidence of such an arrangement, and, as a Type II agreement, is consistent with the context of the negotiations.

Turning to the third factor, where the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, *see Adjustrite*, 145 F.3d at 548, these same omissions may actually support finding a binding Type II agreement, *see Tribune*, 670 F.Supp. at 499. The MOU leaves open terms-critical to every aspect of the Jay Street Project, from design, to business structure, to ownership and management. However, these omissions do not warrant against finding the MOU enforceable as a Type II agreement. In view of indeterminate regulatory and market conditions, JMB and Cara simply elected to pursue rezoning first, leaving finalization of project design and execution for later negotiation within the framework described in the MOU.

Consistent with views expressed in our discussion of the MOU as a Type I agreement, we find that the fourth prong, partial performance, cuts strongly in favor of finding the MOU to be a Type II agreement. JMB provided extensive and valuable performance within the framework described by the MOU. Plaintiffs are entitled to demand defendants' good faith in negotiating remaining open terms.

Finally, while the requirement for a more formal future contract may be terminal to a Type I claim, Type II agreements, by definition, comprehend the necessity of future negotiations and contracts. Here, there can be little debate that creation of the holding corporation, construction, financing, and management of the Property, all required more formal and extensive contracts, both practically and as matters of customary form. The MOU clearly contemplated these future agreements, and, after rezoning, the parties expended considerable effort to negotiate some of these agreements.

■ Defendants' contention that enforcement of the MOU as a Type II preliminary agreement is barred by the New York Statute of Frauds, N.Y.G.O.L. § 5–703, is without merit.[3] N.Y.G.O.L. § 5–703(1) provides that:

> An estate or interest in real property . . . or any trust or power, over or concerning real property, or in any manner relating thereto, cannot be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing . . .

N.Y.G.O.L. § 5–703(3) provides that:

> A contract to devise real property or establish a trust of real property, or any interest therein or right with reference thereto, is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith, or by his lawfully authorized agent.

The requirement for a signed writing does not prohibit enforcement of the MOU as a Type II preliminary agreement. First, read as a Type II agreement, the MOU does not purport to create, convey, transfer, or assign an interest in real property. N.Y.G.O.L. § 5–703(1) and (3). While conveyance of the Jay Street Property to a hypothesized corporate entity is contemplated as part of the broader framework described, the nature of the corporation, its ownership, and the terms of the transfer remain as open terms that must be negotiated in the future. The MOU creates only an obligation for defendants to negotiate in good faith these and other terms within the broader framework. The

MOU does not, by itself, give rise to any enforceable rights or duties that alter defendants' interests in the Property. Second, assuming, *arguendo*, that the obligation to negotiate in good faith does somehow implicate an interest in property sufficient to bring the MOU under N.Y.G.O.L. § 5–703, it is a writing. Of course, enforcement of that writing as to Tracto will turn on facts presently subject to genuine dispute, including whether Tracto or its lawful agent signed the writing, N.Y.G.O.L. § 5–703(1) and (3), or whether there was partial performance, N.Y.G.O.L. § 5–703(4). *See* Section III, *infra.*

For these reasons we reverse the judgment of the District Court to the extent that it dismissed causes of action based on plaintiffs' claim that the MOU is a Type II preliminary agreement. We hold that the MOU is a Type II preliminary agreement binding the parties to negotiate in good faith terms necessary to pursue joint development of the Jay Street Property. We remand for further proceedings consistent with this holding.

## II. *The MOU did not form a joint venture.*

■ Plaintiffs' contract causes of action turn, in part, on the formation of a joint venture. Magistrate Judge Pollak recommended that the District Court find that the MOU did not form a joint venture based, *inter alia*, on the fact that the MOU does not adequately provide for the sharing of losses. The District Court adopted this recommendation. We affirm.

■ "The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as

---

**3.** Because we hold that the MOU is not enforceable as a Type I agreement, we need not reach defendants' argument that enforcement

of the MOU as a Type I agreement is barred by the New York Statute of Frauds.

joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses." *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 298, 765 N.Y.S.2d 575 (2003); *see also SCS Communications, Inc., v. Herrick Co., Inc.,* 360 F.3d 329, 341 (2d. Cir.2004). Because the MOU does not provide for either joint proprietorship or the sharing of losses we agree with the lower courts that it does not form a joint venture.

Nothing in the MOU indicates a clear agreement to create a joint proprietorship. The MOU contemplates formation of a "combined entity" that will assume ownership of the Property. While JMB may assume that it will be part owner of that entity, there is nothing in the language of the MOU that requires that result. Specifically, the MOU does not exclude Cara's having full ownership of the holding corporation, and the Property, with rights to a majority of the proceeds and some project control reserved to JMB in consideration of its proposed efforts to develop the Project. This may seem an odd interpretation of the MOU. However, considering that Cara agrees to "provide" a piece of valuable real estate while JMB agrees only to "front" $175,000, it seems more odd to read the MOU as providing to JMB both ownership and a lion's share of the revenue.

Further, while paragraphs seven and eight of the MOU provide for a division of the proceeds, and paragraph eleven describes how that division would be adjusted if equity partners are sought instead of, or in addition to, debt financing, there are no equivalent sections that provide for a sharing of losses. JMB claims that, if the Project failed, JMB would lose the money and resources committed to the rezoning effort. The text of the MOU does not support that claim. According to the MOU, JMB agrees to "front" $175,000 for the "costs of development." However, there is nothing in the MOU to indicate who would be responsible for any money fronted by JMB and subsequently lost. Similarly, while the MOU contemplates each of the party's taking responsibility for the compensation of named consultants, the MOU does not indicate that these expenses cannot be recouped later when the Project succeeds or fails. Without such an assurance, the MOU cannot be read as providing for a division of losses.

On appeal, defendants argue that the sharing of losses is obvious from the formation of a jointly owned corporation. Relying again on our opinion in *SCS,* defendants claim that this joint ownership is sufficient to demonstrate an agreement to share losses. 360 F.3d at 341–42. That reliance would be compelling if the MOU contemplated "equal ownership" of the Jay Street Project. *SCS,* 360 F.3d at 342. It would even be compelling if joint, but unequal, ownership was explicitly contemplated. *See Richbell,* 309 A.D.2d at 298, 765 N.Y.S.2d 575. However, given that the MOU does not demonstrate a clear commitment to jointly own the Property, JMB cannot rely on shared ownership to imply sharing of losses.

We therefore affirm the judgment of the District Court insofar as it granted summary judgment to defendants on plaintiffs' claim that the MOU created a joint venture.

### III. *Dismissal of viable claims against Tracto was improper.*

 Magistrate Judge Pollak erred by recommending, and the District Court erred by effecting, dismissal of plaintiffs' claims against Tracto based solely on

*plaintiffs'* failure to carry their burden on their cross-motion for summary judgment. That outcome could only have been justified if the lower courts, on proper analysis, had granted *defendants'* motion for summary judgment. This did not occur.

According to the terms of the MOU, Cara, by signing, commits himself "and his companies, entities, etc., [to] work together [with JMB] to develop, build, market, and manage" the Jay Street Project. Plaintiffs moved for summary judgment as to Tracto's being bound to perform under the MOU. The District Court properly denied that motion because the language of the text does not name or necessarily include Tracto among the Cara parties. Effecting a grant of summary judgment to Tracto was improper because the obverse is also true.

On the present record, significant disputes of fact remain as to 1) whether Charles Cara, exercising actual or apparent authority, entered Tracto into the MOU; and 2) whether Tracto, by partially performing and accepting the benefits of plaintiffs' partial performance, is estopped from denying or disclaiming its obligations to negotiate in good faith under the MOU. Because these disputes of fact persist, the District Court was absolutely right to deny plaintiffs' motion for summary judgment as to Tracto. That denial did not, however, entitle the District Court, without discussion, to effect a grant of Cara's motion for summary judgment by dismissing claims against Tracto. We therefore vacate the judgment of the District Court dismissing claims against Tracto and remand for further proceedings consistent with this order.

## IV. *Defendants' assertion that plaintiffs' contract claims are moot is remanded.*

During prior stages of this litigation a *lis pendens* and an injunction were in effect on the Jay Street Property. We granted defendants' motion to vacate on February 17, 2005. Defendants allege that the Property has since been sold to a third-party, rendering moot all claims for specific performance against presently named defendants. This argument is new on appeal and raises a number of factual and legal questions that are best addressed by the District Court in the first instance. We therefore remand without further comment.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is AFFIRMED, in part, REVERSED, in part, VACATED, in part, and REMANDED for further proceedings consistent with this order.