**FCOF UB SECURITIES LLC et al., Plaintiffs,**

**v.**

**MOREQUITY, INC., Defendant.**

**No. 09 Civ. 0551(VM).**

United States District Court, S.D. New York.

Sept. 29, 2009.

Marc E. Kasowitz, Paul Michael O'Connor, III, Seth A. Moskowitz, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, for Plaintiffs.

Michael Barry Carlinsky, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York, NY, for Defendant.

***DECISION AND ORDER***

VICTOR MARRERO, District Judge.

Plaintiffs FCOF UB Securities LLC ("FCOF UB") and FCOF UST LLC ("FCOF UST") (collectively "FCOF") filed the complaint in this action on January 20, 2009 alleging that defendant MorEquity, Inc. ("MorEquity") breached its contractual obligations and its duty to negotiate in good faith arising out of an executed letter entitled "Initial Commitment to Purchase" ("Initial Commitment"). MorEquity now moves to dismiss FCOF's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). MorEquity asserts that: (1) the Initial Commitment is not a binding agreement that can support FCOF's breach of contract claim; (2) in the absence of an enforceable contract, FCOF cannot state a claim for violation of good faith and fair dealing; and (3) FCOF is not entitled to damages or specific performance. For the reasons discussed below, MorEquity's motion to dismiss is GRANTED in part and DENIED in part.

## I. *BACKGROUND*[1]

### A. *PARTIES*

FCOF UB and FCOF UST are limited liability companies organized under Delaware law whose businesses focus on investments in various types of assets, including residential mortgage loans and residential real estate. MorEquity is a mortgage lender and a wholly owned subsidiary of American General Finance ("AGF"), a member of American Insurance Group ("AIG"). MorEquity is a corporation organized under Nevada law.

### B. *FACTUAL ALLEGATIONS*

In mid-2008, representatives of FCOF and MorEquity began discussions related to FCOF's purchase of certain assets held by MorEquity. In November 2008, MorEquity approached FCOF with an offer to sell the assets, and requested that

1. The following facts are taken from FCOF's Complaint ("Complaint") and all documents attached thereto or referenced therein. The Court accepts the facts alleged here as true for the purpose of ruling on a motion to dismiss. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 180 (2d Cir.2008). Except where specifically referenced, no further citation to these sources will be made.

FCOF submit a bid to purchase. In connection with that offer, MorEquity stated that the transaction must close by December 19, 2008. Shortly thereafter, FCOF submitted a bid to purchase the assets from MorEquity. Following negotiations concerning the material terms of the transaction, FCOF and MorEquity executed a purchase agreement, on November 26, 2008, entitled "Initial Commitment to Purchase". MorEquity agreed to sell, and FCOF agreed to purchase, 2,892 first-lien performing, sub-performing and non-performing residential mortgage loans, and certain residential real estate. The Initial Commitment provided a closing date of December 19, 2008.

The Initial Commitment included a detailed description of the assets to be sold and a detailed pricing mechanism, and specified that the closing was subject to the negotiation and execution of a mutually acceptable Asset Purchase and Interim Servicing Agreement. (Complaint at 5.) However, MorEquity would not execute the Initial Commitment until the parties had also agreed to a form of the Asset purchase and Interim Servicing Agreement. As a result, FCOF provided a form of the Asset Purchase and Interim Servicing Agreement to MorEquity, and MorEquity made certain changes, all of which were accepted and agreed to in substance by FCOF. The Asset Purchase and Interim Servicing Agreement was attached as an exhibit to the Initial Commitment.

In anticipation of the settlement date of December 19, 2008, FCOF alleges that it took steps to close the transaction, including: establishing two statutory trusts to hold the loans; gathering the capital necessary to fund the transaction; and negotiating terms of the Interim Servicing Agreement with MorEquity. On December 4, 2008, the parties also entered into a bailee agreement with Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to which Wells Fargo agreed to act as the bailee of the collateral pending the closing of the sale. FCOF was charged $28,790.44 by Wells Fargo for custodial services related to the bailee agreement. In addition, FCOF had essentially completed the due diligence necessary to close the transaction prior to when MorEquity abandoned the transaction.

On December 17, 2008, MorEquity President Kevin Small ("Small") called Michael Fallacara, one of FCOF's representatives. Small stated that MorEquity's parent corporation, AIG, no longer needed the funds that would be generated by the transaction, and thus would not permit MorEquity to close the transaction and sell the assets to FCOF. On the same day, Rick Geissinger ("Geissinger") of AGF called another of FCOF's representatives, Tony Ettinger, and informed him that AIG prohibited MorEquity from closing the transaction. Geissinger confirmed the message conveyed on December 17 in an e-mail stating that MorEquity was "constrained" by its ultimate parent, AIG, from further discussions with FCOF regarding the transaction. (Complaint at 7.)

On December 18, 2008, FCOF sent a letter by e-mail and overnight delivery to MorEquity requesting that MorEquity immediately advise of its availability to finalize and close the transaction. MorEquity has not responded to this letter and has not otherwise contacted FCOF concerning closing the transaction.

FCOF asserts that MorEquity wrongly refused to negotiate, finalize and execute the Asset Purchase and Interim Servicing Agreement despite the terms of the executed Initial Commitment. FCOF claims that MorEquity is in breach of contract because it failed to perform the contractual obligations mandated by the Initial Commitment.

FCOF further argues that MorEquity is in breach of the implied covenant of good faith and fair dealing. FCOF claims that the Initial Commitment imposed an implied obligation to negotiate in good faith, and to deal fairly, in working toward closing the transaction.

FCOF seeks recovery of damages incurred from MorEquity's breach. FCOF seeks specific performance of MorEquity's obligations under the Initial Commitment, an award of money damages resulting from MorEquity's breach, and an award of pre-judgment interest at the maximum rate allowed by law.

## II. *DISCUSSION*

### A. *LEGAL STANDARD*

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff has failed to offer factual allegations sufficient to render the asserted claim plausible on its face. *See Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Publ. Offering Secs. Litig.,* 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks and citation omitted).

For the purposes of deciding a motion to dismiss, the Court accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Iqbal,* 129 S.Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d cir.2002) (all reasonable inferences shall be drawn in plaintiff's favor). However, allegations that are no more than legal conclusions "are not entitled to the assumption of truth." *Iqbal,* 129 S.Ct. at 1950.

### B. *BREACH OF CONTRACT*

MorEquity contends that FCOF's breach of contract claim should be dismissed because the Initial Commitment is simply an agreement to agree that is unenforceable under New York law. MorEquity argues that the Initial Commitment did not create binding obligations, but was rather merely an initial starting point for negotiations for the sale of as-yet-to-be-determined assets for an as-yet-to-be-determined price. As support, MorEquity asserts that the parties did not intend to be bound by the Initial Commitment, and that the existence of essential open terms renders the Initial Commitment unenforceable. FCOF responds that it has sufficiently pleaded that, based on the language of the Initial Commitment and the context of the negotiations, the Initial Commitment is a binding preliminary agreement.

#### 1. *Legal Standard*

Under New York law, "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material

terms." *Tractebel Energy Mktg. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 95 (2d Cir.2007). "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Brown v. Cara,* 420 F.3d 148, 153 (2d Cir.2005) (*quoting Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998)). "In some circumstances, however, preliminary agreements can create binding obligations." *Id.* (*quoting Adjustrite,* 145 F.3d at 548).

A framework for analyzing whether a preliminary agreement is a binding contract was articulated in *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 496–99 (S.D.N.Y.1987), and applied by the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 71–72 (2d Cir.1989) and in *Brown,* 420 F.3d at 153–58. Under this framework, preliminary agreements:

> cover a broad scope ranging in innumerable forms and variations from letters of intent which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed, to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.

*Tribune,* 670 F.Supp. at 497.

"The extent of the obligations created depend on the type of preliminary agreement in question." *Brown,* 420 F.3d at 153. There are at least two distinct types of binding preliminary agreements. *See Tribune,* 670 F.Supp. at 498. "Type I" preliminary agreements occur when the parties have reached "complete agreement ... on all the issues perceived to require negotiation." *Id.*; *Brown,* 420 F.3d at 153. Parties to a Type I agreement have agreed to, and are thus bound to, their ultimate contractual objective, even if the agreement still needs to be formalized in a subsequent agreement. *See Brown,* 420 F.3d at 154; *Adjustrite,* 145 F.3d at 548; *Tribune,* 670 F.Supp. at 498. By contrast, "Type II" agreements do not bind the parties to their ultimate contractual objective. *See Brown,* 420 F.3d at 153; *Adjustrite,* 145 F.3d at 548; *Tribune,* 670 F.Supp. at 498. Rather, a Type II agreement reflects agreement on certain major terms, but leaves others open for further negotiation. *See Brown,* 420 F.3d at 153; *Tribune,* 670 F.Supp. at 498. Nevertheless, parties to a Type II agreement are obligated to negotiate in good faith toward a final contract incorporating the agreed terms. *See Brown,* 420 F.3d at 157; *Tribune,* 670 F.Supp. at 498. While this obligation does not guarantee that the final contract will be concluded, it does "bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Tribune,* 670 F.Supp. at 498.

In determining whether a binding preliminary agreement of either type exists, "prime significance attaches to the intentions of the parties and to their manifestations of intent." *Tribune,* 670 F.Supp. at 497. "A primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Id.* But "it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation." *Id.* at 498.

There are four considerations courts use to help determine whether the parties intended to be bound by a Type I agreement: (1) whether there is an expressed reservation of the right not to be

bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *See Winston v. Mediafare Entm't,* 777 F.2d 78, 80 (2d Cir.1985); *Brown,* 420 F.3d at 154 (*citing Adjustrite,* 145 F.3d at 549). Courts have also found these considerations helpful in determining whether the agreement is a binding Type II agreement to negotiate in good faith. But for the Type II inquiry, courts place more emphasis on the context of the negotiations and less on the existence of unresolved terms. *See Brown,* 420 F.3d at 157 (*quoting Tribune,* 670 F.Supp. at 499) (finding that considerations applied to determination of Type II agreement are similar to considerations for Type I, but "have a somewhat different significance"); *Spencer Trask Software & Info. Svcs. LLC v. RPost Int'l Ltd.,* 383 F.Supp.2d 428, 441 (S.D.N.Y. 2003) (finding Type I agreement considerations to be instructive in discerning a Type II agreement, "altering the factors considered only slightly and placing less of a focus on the existence of unresolved terms"). Therefore, the relevant considerations for determining whether an agreement is a binding Type II agreement are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *See Brown,* 420 F.3d at 157 (*citing Arcadian,* 884 F.2d at 72).

2. *Application*

Applying these considerations to the facts alleged here, the Court finds that the Complaint alleges sufficient facts to plausibly claim that the Initial Commitment constitutes either a binding Type I or Type II agreement, and that MorEquity breached the binding preliminary agreement.

First, the language of the Initial Commitment supports the plausibility of a binding preliminary agreement. Under the framework articulated in *Tribune,* the language of the agreement is the first and most important factor to be considered. *See Tribune,* 670 F.Supp. at 499 (the "first and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities"); *Spencer Trask,* 383 F.Supp.2d at 441 (finding the language of the agreement to be the most important factor in discerning the existence of either type of binding preliminary agreement). The Initial Commitment contains no express statement that the parties did not intend to be bound by that document. To the contrary, the Initial Commitment contains language that indicates that the parties may have intended to be bound. Most strikingly, the Initial Commitment was "Accepted and Agreed" by both parties, (Complaint, Ex. A), indicating that the parties may have intended to be bound. *See Tribune,* 670 F.Supp. at 499–500 (finding that "terminology of binding contract" evidences intent to be bound, and relying on use of words "Accepted and Agreed" to find intention to create a binding agreement); *Ward v. PriCellular Corp.,* No. 90 Civ. 5214, 1991 WL 64043, at *7 (S.D.N.Y. Apr. 16, 1991) (finding that the terms "agrees" and "accepts" suggest that the letter of intent is a binding agreement). Further, it can reasonably be inferred from the language of the Initial Commitment that the parties intended to create enforceable rights and obligations. For

example, the Initial Commitment provides that "Seller shall not assign this letter with out [sic] the express written consent of the Buyer." (Complaint, Ex. A at 3).

FCOF's allegations as to partial performance also support a finding that the parties may have intended the Initial Commitment to create enforceable obligations. Assuming FCOF's representations to be true, they have taken significant steps in reliance on the Initial Commitment. Among other things, FCOF established two statutory trusts to hold the loans in question, and completed the due diligence required by the Initial Commitment in preparation for the asset purchase.

MorEquity contends that the existence of open material terms requires the Court to find that there is no binding Type I agreement. MorEquity points out that the terms of the Initial Commitment are subject to modification. FCOF responds that the Initial Commitment contains the material terms necessary to close the transaction, including a detailed description of the assets to be sold and a detailed pricing mechanism. Parties are not obliged to negotiate every final detail of a contract before a binding preliminary agreement exists. *See Vacold LLC v. Cerami,* 545 F.3d 114, 128 (2d Cir.2008) (stating that there is a strong presumption against finding a binding contract where there are open terms, but that the parties' intent is ultimately controlling and courts should not "disappoint legitimately bargained contract expectations"); *Tribune,* 670 F.Supp. at 499 (same); *Henri Assocs. v. Saxony Carpet Co., Inc.,* 249 A.D.2d 63, 671 N.Y.S.2d 46, 49 (1st Dep't 1998) ("a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula"). The Initial Commitment refers to a specific pool of assets, and contains language suggesting that the parties intended to be bound by a pricing mechanism defined in the Initial Commitment. FCOF has made a facially plausible claim that MorEquity was bound by obligations arising out of the Initial Commitment.

Alternatively, even if open terms in the Initial Commitment were never finalized, FCOF has pleaded sufficient facts to allege MorEquity's breach of a binding Type II agreement. Parties to a Type II agreement have agreed to proceed toward a contractual goal, but have left necessary terms for later negotiation. *See Brown,* 420 F.3d at 157. Here, even if necessary terms to a binding agreement remain unresolved, FCOF has sufficiently alleged that the parties intended to be bound to negotiate in good faith toward an ultimate contractual goal. The Initial Commitment begins, "[FCOF] agree[s] to purchase" and "MorEquity, Inc. [ ] agrees to sell." (Complaint, Ex. A at 1.) The Initial Commitment also refers to a settlement date and due diligence to be conducted in anticipation of "[t]he closing of the transaction." (Complaint, Ex. A at 2.)

FCOF also alleges that both parties were in the midst of working toward a final agreement, as agreed upon in the Initial Commitment, when MorEquity broke off negotiations. Taken as true, FCOF's allegations support its claim that the Initial Commitment created an enforceable obligation to negotiate toward a final agreement. *See Brown,* 420 F.3d at 158 (finding the existence of a Type II agreement to be consistent with the context of the negotiations); *Tribune,* 670 F.Supp. at 500–01 (finding that the context of negotiations demonstrated a binding commitment to negotiate).

MorEquity argues that the type of transaction in question would normally be finalized in a formal contract, thus precluding a finding that the Initial Commitment

is a binding agreement. However, the question of whether it is customary to accord binding force to a certain type of preliminary agreement is a question of fact to be determined, in significant part, based on industry custom. *See Tribune,* 670 F.Supp. at 503 (relying on customary practices of relevant business community to determine whether type of agreement would normally be finalized); *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods.,* 401 B.R. 598, 627 (S.D.N.Y.2009) (looking to industry custom to determine whether preliminary agreement is typically formalized in writing). The factual nature of this determination thus also weighs in favor of denying the motion to dismiss.

The Court notes that it has not yet determined as a matter of law that a contract exists, or whether the Initial Commitment is more appropriately classified as a Type I or Type II agreement. For now, because FCOF has alleged sufficient facts to support a plausible claim that MorEquity has breached a binding preliminary agreement, the Court denies MorEquity's motion to dismiss as to the breach of contract claim.[2]

C. *BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING*

MorEquity contends that the FCOF's second cause of action, for violation of the implied covenant of good faith and fair dealing, should also be dismissed for failure to state a claim. MorEquity argues that there can be no such claim in the absence of an enforceable agreement.

It is well-settled that New York law recognizes an implied covenant of good faith and fair dealing in every contract. *See, e.g., M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990). Under the covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407 (2d Cir.2006) (*quoting Galesi,* 904 F.2d at 136). Nevertheless, New York law requires dismissal of an implied covenant claim where the claim derives from the same set of facts as a breach of contract claim. *See, e.g., Simon v. Unum Group,* No. 07 Civ. 11426, 2008 WL 2477471, at *4 (S.D.N.Y. June 19, 2008) (dismissing good faith and fair dealing claim as duplicative of breach of contract claim); *Argonaut P'ship L.P. v. Bancomer, S.A.,* Nos. 96 Civ. 2222, 00 Civ. 4244, 2001 WL 585525, at *3 (S.D.N.Y. May 30, 2001) (same).

FCOF's implied covenant claim must be dismissed, regardless of whether the Initial Commitment constitutes a binding agreement. If the Initial Commitment is a binding preliminary agreement, FCOF's claim is duplicative of its contract claim. Alternatively, if no binding agreement is found, FCOF's implied covenant claim will fail for lack of a valid and binding contract from which such a duty would arise. *See Beekman Inv. Partners, L.P. v. Alene Candles, Inc.,* No. 05 Civ. 8746, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) (*quoting American–European Art Assocs., Inc. v. Trend Galleries, Inc.,* 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1st Dep't 1996)) ("A cause of action for breach of an implied duty of good faith and fair dealing ... [is] properly dismissed for lack of a valid and binding contract from which such

2. Because the Court is not determining whether the Initial Commitment constitutes a binding agreement, it is premature to determine what form of damages might be appropriate. The Court will not address MorEquity's motion to dismiss as to the issue of damages or specific performance.

a duty would arise."). The Court therefore grants MorEquity's motion to dismiss as to the implied covenant claim.

### III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendant, MorEquity, Inc. to dismiss this action (Docket No. 5) for failure to state a claim is GRANTED with respect to the claim for breach of the implied covenant of good faith and fair dealing, and DENIED with respect to the breach of contract claim.

The parties are directed to appear at a pretrial conference on October 23, 2009 at 11:00 a.m. and, in preparation for that conference, to confer and propose an agreed upon Case Management Plan in the form provided by the Court.

**SO ORDERED.**