**BEAR STEARNS INVESTMENT PRODUCTS, INC., Plaintiff,**

v.

**HITACHI AUTOMOTIVE PRODUCTS (USA), INC. and Tokico (USA) Inc., Defendants.**

**No. 06 cv 15311(CM).**

United States District Court,
S.D. New York.

March 4, 2009.

Don Abraham, Gibbons P.C., Jeffrey A. Mitchel, Gibbons Del Deo, Edward Timothy McAuliffe, Jr., Dreier LLP, New York City, for Plaintiff.

Dominic Joseph Picca, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., New York City, for Defendants.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Bear Stearns Investment Products, Inc. ("Bear Stearns") brought this action against Hitachi Automotive Products (USA), Inc. ("HAP") and Tokico (USA), Inc. ("Tokico") (collectively, "Hitachi") alleging (i) breach of contract and (ii) breach of the obligation to negotiate in good faith. Before this Court are the parties' cross motions for summary judgment. For the reasons stated below, both motions are granted in part and denied in part.

### Background

*Hitachi and the Delphi Bankruptcy*

HAP is in the business of manufacturing, selling and marketing electronic components for engine management systems for the automotive industry. (Defs.' Rule 56.1 Stmt. ¶ 1.) Tokico manufactures, sells and markets breaks, suspension components and systems for the automotive industry. (*Id.* ¶ 2.) HAP is a wholly-owned subsidiary of Hitachi America, Ltd., which, in turn, is a wholly-owned subsidiary of Hitachi, Ltd. Tokico is a wholly owned subsidiary of Hitachi, Ltd. (Pls.' Rule 56.1 Stmt. ¶ 11; Defs.' Rule 56.1 Counter–Stmt. ¶ 11.) Hitachi had a business relationship with Delphi Automotive Systems, L.L.C. ("Delphi") whereby Hitachi manufactured for and sold to Delphi various automotive parts, including electronic throttle bodies

and air induction systems components for automotive engine management systems, and navigation boards for GPS navigation systems. (Defs.' Rule 56.1 Stmt. ¶ 3.)

In October 2005, Delphi filed for bankruptcy protection in this District. *In re Delphi Corp., et al.,* 05–cv–44481. As of the date of that filing, Delphi owed HAP approximately $5,721,969.77, and owed Tokico approximately $1,708,509.29 for unpaid invoices for automotive parts supplied by Hitachi. (*Id.* ¶ 5.) The total debt owed to Hitachi at the time of Delphi's filing was $7,430,479.06 (collectively referred herein as the "Claims"). (*Id.*)

*The Bankruptcy Claims Trading Industry*

There is a market for the purchase and sale of claims held by creditors against debtors in bankruptcy, such as the one held by Hitachi against Delphi. It is sometimes referred to as the "trade claim industry" or "trade claim market." (*Id.* ¶ 6; Pls.' Rule 56.1 Stmt. ¶ 5.) Normally, a purchaser of a claim, also referred to as a "receivable," pays a percentage of the face value of a claim as the purchase price. (Pls. Rule 56.1 Stmt. ¶ 8.) The purchaser is betting that he is paying less for the claim than will ultimately be paid out by the bankruptcy court, or that he can sell it to a third party for a higher price prior to the confirmation of the liquidation plan in the bankruptcy court. (*Id.* ¶ 9; Defs.' Rule 56.1 Counter–Stmt. ¶ 9.)

*Marketing the Delphi Claims*

In early 2006, Hitachi decided to seek out a buyer to purchase the Delphi Claims at a discounted rate in order to (i) remove the debt from its books and (ii) maximize with certainty the amount of cash it would receive. (Defs.' Rule 56.1 Stmt. ¶ 8.) Hitachi assembled a group of executives, known as the "Delphi/GM team," to find a buyer for the Delphi Claims. (Pls. Rule 56.1 Stmt. ¶¶ 20, 21.) Hitachi's Delphi/GM team included: Kazumichi Fujimura ("Fujimura"), the General Manager of Hitachi, Ltd.'s Automotive Systems Group; Ken Funasaki ("Funasaki"), President of HAP; Tillie Lim ("Lim"), in-house counsel for Hitachi America, Ltd.; and Eric Costiniano ("Costiniano"), Senior Credit Manager for Hitachi America, Ltd. (*Id.*) Members of the GM/Delphi team consulted with Hitachi's outside counsel, Mintz Levin Cohn Ferris Glovsky & Popeo ("Mintz Levin") on the contemplated sale of the Delphi Claims. (Pls. Rule 56.1 Stmt. ¶¶ 17, 28.) Costiniano acted as the "point person" for pricing the Claims to prospective purchasers in the United States. (Pls.' Rule 56.1 Stmt. ¶ 31; Defs.' Rule 56.1 Counter–Stmt. ¶ 31.)

Hitachi had never before attempted to sell a bankruptcy claim in the United States, though there is evidence that defendant's affiliate—Hitachi Chemical—previously sold receivables it owned against Delphi to Merrill Lynch. (Lim Decl. ¶ 7; Defs.' Rule 56.1 Stmt. ¶ 9; Pls.' Rule 56.1 Counter–Stmt. ¶ 9; Mitchell Decl. Ex. 31.) Fujimura had some knowledge about the sale of receivables, but there is no evidence that he had experience in the claims trading industry in the United States. (Pls. Rule 56.1 Stmt. ¶ 24; Defs.' Rule 56.1 Counter–Stmt. ¶ 24; Funasaki Dep. Tr. 51:14–19.) Prior to June 2006, Costiniano had been involved in the sale of three trade claims, unrelated to Hitachi, to liquidators for amounts in the thousands of dollars. (Pls. Rule 56.1 Stmt. ¶ 29; Defs.' Rule 56.1 Stmt. ¶ 29; Costiniano Dep. Tr. 53:10–54:23.) Costiniano tried to educate himself about the trade claim industry in connection with the sale of the Dephi receivables. (Pls.' Rule 56.1 Stmt. ¶ 34; Defs.' Rule 56.1 Counter–Stmt ¶ 34.)

To market the Claims, Costiniano worked with Hitachi's insurance broker at Marsh Incorporated to identify and contact potentially-interested parties. (Pls.

Rule 56.1 Stmt. ¶¶ 35–37.) During April and May 2006, Hitachi received assignment of claim forms, one of the documents that defines the terms of a claim transfer, from several financial institutions. (Pls. Rule 56.1 Stmt. ¶ 39; Defs.' Rule 56.1 Counter–Stmt. ¶ 39.) Costiniano forwarded the assignment of claim forms to Lim for her review. (Pls.' Rule 56.1 Stmt. ¶ 40.) Hitachi contends that it received these forms as "examples" only and that it was not actively negotiating their terms with potential buyers. (Defs.' Rule 56.1 Counter–Stmt. ¶¶ 38, 39.)

On or about May 23, 2006, Hitachi was focusing on three potential purchasers for the Delphi Claims—AMROC, Argo Partners and CSFB. (Pls.' Rule 56.1 Stmt. ¶ 41; Defs.' Rule 56.1 Counter–Stmt. ¶ 41.)

*Bear Stearns Becomes a Potential Purchaser*

The Bear Stearns "Special Situations Group" trades in distressed debt, including the purchase and sale of bankruptcy claims. (Pls.Rule.56.1.Stmt.¶¶ 3–5.) In early 2006, representatives of Bear Stearns approached Hitachi about the possibility of purchasing the Delphi Claims. (Defs.' Rule 56.1 Stmt. ¶ 10.) In late May, Lim contacted Cindy Evans ("Evans"), Vice President of Sales in the Special Situations Group, to request a copy of the Bear Stearns Assignment of Claim form (hereinafter, the "Bear Stearns Form"). (Pls. Rule 56.1 Stmt. ¶ 46.) On May 31, 2006, Evans sent Lim the Bear Stearns Form. (Defs.' Rule 56.1 Stmt. ¶ 11.)

The parties dispute the import of the Bear Stearns Form that was sent to Hitachi on May 31, Bear Stearns contends that the Form contained the terms it proposed to use to consummate the sale of the Delphi Claims (Pls.' Rule 56.1 Counter–Stmt. ¶ 12; Mitchell Decl. Ex. 4 at H02383), while Hitachi asserts that the Form was merely an example of the standard Bear Stearns assignment of claim form, and was not intended or prepared to reflect any agreement that had been reached between the parties on terms of the sale. (Defs.' Rule 56.1 Stmt. ¶ 12; Picca Decl. Ex. 10, Evans Dep. Tr. 133:9–17.) Everyone agrees, however, that as of May 31, Bear Stearns and Hitachi had not come to an agreement, on purchase price or anything else, concerning the sale of the Delphi Claims, and that Hitachi was still considering several other potential purchasers. (Defs.' Rule 56.1 Stmt. ¶¶ 13–14; Pls.' Rule 56.1 Counter–Stmt. ¶¶ 13–14.)

*Bear Stearns Wins the Bid and the June 27 Phone Call*

On June 23, 2006, Fujimura directed Costiniano to collect bids from the candidates vying to purchase the Delphi Claims. (Pls.' Rule 56.1 Stmt. ¶ 56; Mitchell Decl. Ex. 9 at H02557.)

Throughout June, Evans and Costiniano had discussed potential prices Bear Stearns would be willing to pay for the Delphi Claims. (Defs.' Rule 56.1 Stmt. ¶ 15; Picca Decl. Ex. 10, Evans Dep. Tr. 82:7–83:9.)

On June 27, Evans and Costiniano had a telephone call, in which Bear Stearns gave Hitachi a "firm bid" for the Delphi Claims. In the same conversation, Evans and Costiniano agreed on the price, type (i.e. secured or unsecured) and amount of the Delphi Claims that Bear Stearns would purchase from Hitachi. (Defs.' Rule 56.1 Stmt. ¶ 16; Picca Decl. Ex. 10 at H02703; Evans Dep. Tr. 83:23–84:17.) Bear Stearns agreed to pay 80 cents (or 80%) on the dollar for Hitachi's reclamation claims and 73.25 cents (or 73.25%) on the dollar for Hitachi's general, unsecured claims. (Defs.' Rule 56.1 Stmt. ¶ 17.) No terms concerning the proposed sale of the Claims—except for price, type and amount—were discussed during the June

27 call between Evans and Costiniano. (*Id.* ¶ 18.) Costiniano did not raise concerns with the Bear Stearns Form during that conversation.

Evans testified that, after the conversation, she believed that the parties had "come to an agreement that we have a transaction." (Picca Decl. Ex. 10, Evans Dep. Tr. 85:7–12.) Costiniano testified at his deposition that he and Evans agreed during their discussion that there would be "documents that need to be completed," but admitted that he "was not aware that Hitachi had a problem" with the Rear Stearns Form as of June 27, 2006. (Pls. Rule 56.1 Stmt. ¶ 62; Picca Decl. Ex. 6, Costiniano Dep. Tr. 340:4–7; Deposition Excerpts attached to the Mitchell Decl. (hereinafter, "Pls.' Dep. Excerpts") Ex. 1, Constiniano Dep. Tr. 215:5–17.)

Following their phone conversation, Evans sent Costiniano an e-mail confirming Bear Stearns bid price of $73.25 for the general, unsecured Delphi Claims. (Picca Decl. Ex. 12.) Evans then forwarded that e-mail to Lim, and notified her that the parties had "come to a resolution" and that Bear Stearns would have its "lawyers start drafting the trade confirm and assignment of claim." (Picca Decl. Ex. 12 at H00012.)

That same day, Lim, counsel for Hitachi, sent an e-mail to Paul Ricotta, Hitachi's outside counsel at the Mintz Levin law firm with the subject line "Bear Wins" and telling him that, "Hitachi has selected Bear Stearns as the purchaser of the Delphi Receivables," and directing Ricotta to stop reviewing proposals from other parties. (Pls. Rule 56.1 Stmt. ¶¶ 58–59, Mitchell Decl. Ex. 11.)

*Hitachi Receives a Higher Bid*

The next day, on June 28, Fujimura e-mailed Costiniano that he had received a bid of 74.15% for the general, unsecured claims and 82% for reclamation claims from a "certain financial institution," and asked that Costiniano try to negotiate "one more time" with Bear Stearns for a higher price. (Mitchell Decl. Ex. 16 at H00762; Pls.' Rule 56.1 Stmt. ¶¶ 72, 73.) Fujimura noted in his e-mail to Costiniano that he did not "intend to change the entity to sell, and I do not delay the time of signing." (*Id.*)

In response to Costiniano's attempt to renegotiate, Evans wrote him the following e-mail on June 28;

> Yesterday morning, Bear Stearns and Hitachi agreed on a price (73.25%) for your claim of $7,430,479.06 against Delphi Automotive Systems LLC. Acting on this mutual agreement, I sent you a confirmation yesterday afternoon. I wanted to respond to your comment that you had another bid. Often counterparties will discuss bids, but those bids are often not firm and can be retracted. Yesterday you asked for our highest bid and Bear Stearns made a firm bid to you of 73.25%, which was the best in the market place. Both parties agreed to the trade which consummated the terms and the price. Once we agreed on the terms and the price, our trade becomes a binding contract and Bear Stearns has since taken on the economic risk to account for the trade. If other parties try to interfere with the trade Bear Stearns reserves the right to prosecute for torturous [sic] interference. Bear Stearns takes these trades very seriously. Our goal is to try to do what is best for our customers, but a trade is a trade. When we say a trade is done, it is done. I'm sure you can understand our view as it is a process that benefits everyone. It must be understood that these prices fluctuate on a day to day basis, and considering the lack of liquidity sometimes the fluctuation can be substantial in a short period of time. The terms of the trade cannot be adjusted after con-

firmation just because the market place changes for better or worse. I hope you can understand our situation. We look forward to continuing to work with Hitachi, and I hope we can reach an understanding on this matter.

(Mitchell Decl. Ex. 17 at B00034.)

Costiniano forwarded Evans e-mail to members of the Hitachi GM/Delphi team, including Lim and Fujimura. (Mitchell Decl. Ex. 18 at H00785–86.) Fujimura responded to Costiniano's e-mail, copying the other recipients, writing, "Please go ahead with Bear Stearns under the current agreement we reached.... We reached agreement through June 27 meeting (Japan time) to appoint Bear Sterns [sic] ... We should not accept any better bids from unappointed entity after the deadline, even if the changed rate seems more attractive." (*Id.* Ex. 19 at H02815.) Following Fujimura's e-mail, Lim, Costiniano and Ricotta continued to work to finalize their comments on the Bear Stearns Form. (*Id.* Ex. 20; 22; 23.)

Hitachi did not provide Bear Stearns with a response to Evans' June 28 e-mail. (Pls' Rule 56.1 Stmt. ¶ 82.)

*The Trade Documents*

As of June 27, 2006, Hitachi had not provided any comments to anyone at Bear Stearns on the Bear Stearns Form that it had been sent on May 31, 2006. On June 27, following the phone call between Evans and Costiniano, Lim sent Evans an e-mail with an attached mark up with of the Bear Stearns Form. (Picca Decl. Ex. 16.) Hitachi's mark up included the following changes:

· **Paragraph 3**—This provision delineated the circumstances under which Hitachi would be required to re-purchase, or "buy back," the Claims from Bear Stearns. As Bear Stearns drafted the paragraph, a buy back would be triggered if the Claims became subject to an impairment or were objected to in the bankruptcy court proceedings. Hitachi would be required to repay Bear Stearns for the impaired Claims, subject to 10% interest per annum. Hitachi changed the provision such that Hitachi would be required to buy back the Claims from Bear Stearns only after an objection to the Claims was upheld by a *final order* of the bankruptcy court and made the "buy back" Bear Stearns sole and exclusive remedy in the event of an impairment of the Claims. Hitachi also deleted the interest rate requirement. (Picca Deck Ex. 16; Defs. Rule 56. 1 Stmt. ¶¶ 36–42.)

· **Paragraph 6**—Hitachi reworded the provision to limit Hitachi's responsibility to indemnify Bear Stearns. For example, Hitachi inserted language disavowing its responsibility to indemnify Bear Stearns for damages or losses sustained due to Bear Stearns' gross negligence or willful misconduct. (Picca Deck Ex. 16; Defs.' Rule 56.1 Stmt. ¶¶ 44–45.)

· **Paragraph 8**—Hitachi changed the provision such that, once the transfer of the Claims occurred, Hitachi would retain the right to respond to, defend and litigate any impairment of the Claims that arose in the bankruptcy court proceedings. (Picca Deck Ex. 16; Defs.' Rule 56.1 Stmt. ¶¶ 46–51.)

Bear Stearns contends that because Hitachi failed to voice any concerns with the Bear Stearns Form prior to their agreement on price, type, and amount of Claims—which occurred during the June 27 phone call between Evans and Costiniano—Hitachi's comments were not intended to be "deal breakers," but suggestions, which Bear Stearns would negotiate in good faith. (Pls. Rule 56.1 Stmt. ¶¶ 66–67; Pls.' Dep. Excerpts. Ex. 8, Torrado Malley Dep. Tr. 213:11–215:16.)

On July 5, Bear Stearns outside counsel, Tara Hannon ("Hannon") transmitted to Lim via e-mail a "revised version of the Assignment of Claim, marked to show changes from the changes" Lim had sent to Bear Stearns on June 27. (Defs.' Rule 56.1 Stmt. ¶ 53; Picca Decl. Ex. 18.) Bear Stearns revised some of the terms that had been changed by Hitachi in their June 27 mark-up. For instance,

· **Paragraph 3**—Hitachi had inserted a change such that a buy-back right would only be triggered by a "Final Order" of the bankruptcy court. Bear Stearns deleted the term, such that "an order" of the bankruptcy court could trigger the buy-back provision. Bear Stearns also deleted language, inserted by Hitachi, making the buy-back, Bear Stearns' sole and exclusive remedy and reinserted the requirement of 10% annual interest on the repayment. (Defs.' Rule 56.1 Stmt. ¶ 55; Picca Decl. Ex. 18.)

· **Paragraph 6**—Bear Stearns restored the paragraph to its original form. (Defs.' Rule 56.1 Stmt. ¶ 59; Picca Decl. Ex. 18.)

· **Paragraph 8**—Bear Stearns altered the provision such that Hitachi's right to defend, settle or litigation the Claims in response to impairment or disallowance would be exercisable only at Bear Stearns' discretion. (Defs.' Rule 56.1 Stmt. ¶ 60; Picca Decl. Ex. 18.)

On June 27, Bear Stearns also faxed to Hitachi copies of Bear Stearns' Trade Confirmations, a document that evidenced the trade and set forth the terms of the trade, for the (i) general, unsecured claims and (ii) the reclamation claims. (Pls.' Rule 56.1 Stmt. ¶ 68; Picca Decl. Ex. 13.) The Trade Confirmations listed, *inter alia*, the trade date—June 27, 2006—the parties to the trade, the debtor, the price paid for the claims, as well as other terms of the trade consistent with the assignment of claim form. (*Id.*)

On the third page of the Trade Confirmations is a section titled "This transaction is **subject to**." (Picca Decl. Ex. 13) (emphasis supplied). The first paragraph under that section reads,

> Negotiation, execution and delivery of mutually acceptable contracts and instruments of transfer, including, but not limited to, an assignment of claim agreement ("Assignment Agreement") containing customary provisions for the purchase and sale of interests in distressed debt trade claims, to be prepared by Buyer, transferring to the Buyer, among other things, all right, title and interest in, to and under the Claims and Documents.

(*Id.*)

On June 30, Lim provided Bear Stearns with Hitachi's comments to Bear Stearns' Trade Confirmation. (Picca Decl. Ex. 17); Defs.' Rule 56.1 Stmt. ¶ 69. Hitachi made numerous changes to the Bear Stearns Trade Confirmations, including:

· replacing "customary provisions" in the above-quoted paragraph with "mutually acceptable provisions" (Picca Decl. Ex. 17);

· changing the settlement date from "As soon as practicable" to "As soon as practicable, but in no event later than July 17, 2006 unless extended by mutual written agreement of the Buyer and Seller" (*Id.*);

· adding language to confidentiality provision such that Hitachi would be required to cease discussions with third parties on the earlier of the settlement date "or the time that seller notifies buyer that the conditions set forth in this confirmation have not been satisfied" instead of until the settlement date (*Id.*) and;

· deleting the buy-back provision in its entirety (*Id.*).

On July 12, 2006, Bear Stearns responded to Hitachi's edits by transmitting amended Trade Confirmations via e-mail. (Picca Decl. Ex. 19.) Bear Stearns' amended Trade Confirmations made changes to Hitachi's changes, including,

· rejecting Hitachi's insertion of "mutually acceptable" in place of "customary" (Picca Decl. Ex. 19);

· rejecting all of Hitachi's changes to the Confidentiality Section (*id.*);

· reinserting the buy-back provision as written in Bear Stearns original draft and adding a right to receive 10% interest per annum (*Id.*).

In response to Bear Stearns' revisions to Bear Stearns Form and Trade Confirmation, Lim called Hannon on July 18 or July 19, 2006. (Defs.' Rule 56.1 Stmt. ¶¶ 82–83; Picca Decl. Ex. 8, Lim Dep. Tr. 260:2–24.) That phone call did not result in a resolution on the open terms of the trade documents. (Lim Dep. Tr. 260:22–24.)

*The Delphi Preference Action Concern*

Bear Stearns contends that the repayment or buy back provision and the right to defend the claims against impairment in the bankruptcy court, became of great importance to Hitachi because, at some point in July 2006, Hitachi became greatly concerned that Delphi was going to file a $10 million dollar preference action and attempt to offset the Claims. (Pls. Rule 56.1 Stmt. ¶ 86; Pls. Dep. Excerpts Ex 1; Costiniano Dep. Tr. 94:3–95:15.) According to Bear Stearns, in selling the Claims, Hitachi wanted to be sure it would transfer the risk of Delphi's preference action to the buyer—Bear Stearns. (Pls. Rule 56.1 Stmt. ¶ 90.) Bear Stearns argues that it was Hitachi's concern over the possible preference action caused Hitachi to balk at the provisions in the trade documents pertaining to buy back and right to defend the Claims and to delay negotiations. (Pls.' Rule 56.1 Stmt. ¶¶ 91–93.)

Bear Stearns contends that Hitachi did not notify Bear Stearns of the preference action concern during the first month of negotiations of the trade documents. (Pls.' Rule 56.1 Stmt. ¶¶ 87, 103.)

*The August 9, 2006 Meeting*

As part of on-going negotiations, Hitachi representatives met with representatives from Bear Stearns on August 9, 2006 at Bear Stearns' offices in New York. (Defs.' Rule 56.1 Stmt. ¶ 88.) Present at the meeting were Fujimura, Funasaki, and Toru Kamioke for Hitachi and Evans, Laura Torrado, a Senior Managing Director, and Jeffrey Farkas, an analyst, for Bear Stearns. (Pls.' Rule 56.1 Stmt. ¶ 102.)

At that meeting, Hitachi presented a handout that listed three issues in the Bear Stearns Form and Trade Confirmation on which Hitachi believed the parties were still not in agreement: (i) the repayment or buy back provisions; (ii) the exclusivity of the buy back remedy; and (iii) the defense of claims. (*Id.* ¶¶ 89–90; Picca Decl. Ex. 23.) Bear Stearns contends that it first learned that these were the "big issues" for Hitachi in the days immediately prior to the meeting. (Pls.' Rule 56.1 Stmt. 103; Mitchell Deck 36 at H03250.)

The parties met for over two hours, but the Bear Stearns Form and the Trade Confirmations remained unexecuted at the end of the meeting. (Picca Decl. Ex. 8, Lim Dep. Tr. 270:3–6; Ex. 7 Fujimura Dep. Tr. 161:13–25.) At his deposition, Fujimura testified that "Laura [Torrado] told us on August 9 that [Bear Stearns] could not accept [Hitachi's] conditions." (Picca Deck Ex. 7, Fujimura Dep. Tr. 146:24–25.)

*Negotiations Following the August 9 Meeting*

Within two days of the August 9, 2006 meeting, Hitachi became internally concerned that selling the claims to Bear Stearns was "too risky" and that it needed resume its search for another buyer. (Pls.' Rule 56.1 Stmt. ¶ 105; Mitchell Decl. Ex. 37 at H07088.) Internal Hitachi memorandum demonstrate that Hitachi's concern emanated, at least in part, from the language in paragraph three of the Bear Stearns Form regarding a buy back because of the likelihood that Delphi would file a preference claim. (Mitchell Deck Ex. 37 at H07090, attachment to Kamioke e-mail.) In searching for a new bidder, Funasaki e-mailed members of the GM/Delphi team that Hitachi "wanted to make clear to all interested parties the terms that were of priority to it," including the terms related to repayment or buy back. (Defs.' Rule 56.1 Counter–Stmt. ¶ 108; Mitchell Decl. Ex. 38 at H03250.)

Hitachi did not tell Bear Stearns that it was re-marketing the receivables. (Pls.' Rule 56.1 Stmt. ¶ 105.)

At the same time, Hitachi continued negotiations with Bear Stearns. On August 15, 2006, Lim e-mailed Torrado, with others from Bear Stearns copied, with an attached mark up of the Bear Stearns Form. (Picca Decl. Ex. 25.) In the transmittal e-mail, Lim expressed Hitachi's dissatisfaction with Bear Stearns interpretation of the buy back provision as articulated at the August 9 meeting, writing, in relevant part,

> Based on that meeting, Hitachi Automotive Products (USA), Inc.'s ("Hitachi") understanding of Bear Stearns' position is that, in the event of a repayment of ail or any part of the Claim is triggered under section 3 of the current version of the Assignment of Claim agreement (the "Agreement") and Hitachi makes that repayment, Bear Stearns would transfer the entire Claim back to Hitachi and the Agreement would be terminated. Neither party would have further obligations to each other. Apparently, this result would occur even if Hitachi was able to settle or defeat any dispute with the Debtor. This is quite different from our understanding of the deal as it was discussed among the business people and we do not see any language in the current version of the Agreement that provides for a termination of the Agreement upon the repayment of all or any portion of the Claim. From Hitachi's standpoint, this would eviscerate the entire benefit of selling the Claim now. Please let us know if our understanding, as set forth above, is not accurate.

> In an effort to try to move this matter forward, I have enclosed a redlined draft of the Agreement, including changes that would be acceptable to Hitachi. We made our redlines against Tara Hannon's redlined version of July 5, 2006. Please let me know if Bear Stearns is willing to negotiate a deal based on this document. I look forward to hearing from you.

(Mitchell Decl. Ex. 39 at H00129.)

Hannon replied to Lim's e-mail on August 18. (Picca Decl. Ex. 26 at H00319.) In her e-mail, Hannon addressed some of the issues Hitachi raised concerning the "buy back" provision: (i) Bear Stearns agreed to lower the interest rates in the event of a repayment; (ii) Bear Stearns agreed to "be required to hold (i.e. refrain from selling back to Hitachi) a claim on which there is a 'Delayed Distribution' for up to 6 months after first distributions are made to unsecured creditors generally and then would need to have such claim treated as if such claim was disallowed;" and (iii) Bear Stearns asserted that it would require Hitachi to pay Bear Stearns cash

should Bear Stearns end up holding securities in the event of a delayed distribution. (*Id.*) Hannon's e-mail did not address the duty to defend the Claims or the indemnification issues. (*Id.;* Defs.' Rule 56.1 Stmt. ¶ 104.)

Hitachi maintains that Bear Stearns' position as of August 18 amounted to a wholesale rejection of Hitachi's August 15 proposal. (Defs.' Rule 56.1 Stmt. ¶¶ 103, 106–07.) Lim testified that after receiving Hannon's e-mail on August 18, she and Hannon spoke on the phone that same day. Lim told Hannon that Hitachi felt that Hannon's "comments had not responded to our comments of the 15th" and that Hitachi was "disappointed." (Picca Decl. Ex. 8, Lim Dep. Tr. 63: 19–64:2.) She also told Hannon that she was going on vacation and that Ricotta would contact her the following week. (Pls.' Rule 56.1 Stmt. ¶ 111.) The parties agree that at no time during that phone call did Lim tell Hannon Hitachi was prepared to walk away from the transaction. (Pls.' Rule 56.1 Stmt. ¶ 112.)

On August 25, Ricotta, outside counsel for Hitachi, telephoned Hannon to discuss the claim documents. (Defs.' Rule 56.1 Stmt. ¶ 108.) After their telephone conversation, Ricotta e-mailed Lim as follows,

> I just spoke with Tara [Hannon] and gave her a take it or leave it. I said that Hitachi feels that the deal is not what was represented, and that they have done a deal on the terms contained in the revised Assignment Agreement (which you sent her). For both reasons, either BS [Bear Stearns] needs to do the deal on the terms contained in the Assignment, or out clients should walk away. Tara said that she would try to get back to me today or Monday with a final answer.

(Picca Decl. Ex. 27 at H00727.) Bear Stearns maintains that Ricotta never told Hannon in the August 25 phone conversation that Hitachi no longer wanted to close on the deal. (Pls.' Rule 56.1 Stmt. ¶ 114.)

Hitachi claims that neither Hannon nor anyone else at Bear Stearns ever responded to Ricotta. (Defs.' Rule 56.1 Stmt. ¶ 110.) Bear Stearns contends that Evans reached out to Lim on September 1, 2006 to ask where the parties stood on the deal (Mitchell Decl. Ex. 48 at H00146) and Lim never responded. (Pls.' Rule 56.1 Counter–Stmt. ¶ 110.)

At the same time, Hitachi continued to negotiate with third parties for the sale of the Delphi Claims. (Pls.' Rule 56.1 Stmt. ¶ 115; Mitchell Decl. Ex 44.) Hitachi met with Deutsche Bank and Merrill Lynch in Tokyo to discuss the terms of the sale and, asked that bids from those parties be submitted by September 6, 2006. (Mitchell Decl. Ex. 44.) Costiniano also e-mailed a representative of AMROC on August 31, 2006, to solicit a bid for the Delphi receivables. He attached a draft assignment of claim form to his e-mail, noting that the repayment provision was the "critical section." (Mitchell Decl. Ex. 46.)

On September 8, the decision was made internally at Hitachi to sell the Delphi Claims to Deutsche Bank instead of Bear Stearns. (Mitchell Decl. Ex. 49 at H00708.) Fujimura internally be-mailed members of the GM/Delphi team the news, stating,

> This e-mail is to inform you that we decided to sell Delphi's A/R to 'Deutsche Bank' at 76.5%. Reflecting better circumstances with related parties, the price has gone up, fortunately from 73.25% to 76.5%. I strongly hope talks with Deutsche, which is expected to start from next Monday, will go smooth and we can enter into agreement soon, since we had similar talks last month.

(*Id.*) Bear Stearns maintains that it was unaware of Hitachi's negotiations with third parties and its decision to sell the claims to Deutsche bank. (Pls.' Rule 56.1 Stmt. ¶ 115.)

*Hitachi Terminates Negotiations with Bear Stearns*

On September 8, Ricotta again telephoned Hannon. (Defs.' Rule 56.1 Stmt. ¶ 111.) The parties dispute what was said. Hitachi claims that Ricotta told Hannon that all negotiations between Hitachi and Bear Stearns for the Delphi Claims were over. (*Id.* ¶ 112.) Bear Stearns counters that Ricotta told Hannon that Hitachi wanted to close on Hitachi's August 15 version of the Assignment of Claim form— not back out of the transaction. (Pls.' Rule 56.1 Counter–Stmt. ¶ 112; Picca Decl. Ex. 10, Hannon Dep. Tr. 96:19–23.)

In the late afternoon on September 8, Evans e-mailed Lim, Fujimura, Funasaki, but not Ricotta, as follows, in relevant part,

"Tara [Hannon] understood from Paul [Ricotta] that you wish to close immediately on the current documentation for the claim or terminate the transaction. We believe we have a binding transaction with you and wish to close on the transaction. We believe we can live with the current concepts set forth in the documentation but Tara wants to review the documentation again. We look forward to speaking on Monday to wrap this matter up and close the transaction."

(Mitchell Decl. Ex. 50 at H00148.)

On September 11, Evans sent an e-mail to Lim in which she stated, "I just want to make sure you and your client were aware that we want to go through with the trade. You'll see the e-mails from the end of last week and I want to make sure your client is not under the impression we wish to walk away from this trade." (Mitchell Decl. Ex. 52 at H00458.)

At 10:38 a.m. on September 12, 2006, Ricotta sent the following letter as an e-mail attachment to Hannon:

This will follow-up our telephone conversations of Friday, September 8.

Hitachi wishes to inform you that it will cease any further negotiations with Bear Stearns concerning a possible agreement to sell Hitachi's claim in the Delphi bankruptcy case. Among other things, given the inability of the parties to timely agree on the trade confirmation or an Assignment of Claim Agreement, Hitachi has decided to withdraw any offer to sell such claim to Bear Stearns, even if Bear Stearns offers to accept the latest versions of the proposed trade documentation as proffered by Hitachi. Thank you for your efforts in connection with this negotiation.

(Mitchell Decl. Ex. 53.) Six minutes after Ricotta sent his e-mail attaching the above letter to Hannon, Hannon sent an e-mail to Lim with another draft of the Assignment of Claim form, noting that it contained "small tweaks" to the August 15 Hitachi draft. (*Id.* Ex. 54.) Hitachi maintains that these "small tweaks" directly impacted the disputed buy back provision. (Defs.' Rule 56.1 Stmt. ¶ 116.) Lim responded to Hannon's e-mail less than an hour later and told her that negotiations were over. (Picca Decl. Ex. 31 at H00472.) Lim attached another copy of Ricotta's letter to her own e-mail to Hannon. (*Id.*)

At 5:30 p.m. on September 12, Evans sent Lim an e-mail with two attachments. (Defs. Rule 56.1 Stmt. ¶ 118; Pls. Rule 56.1 Counter–Stmt. ¶ 118; Picca Decl. Ex. 32.) The first was a letter to Hitachi from Bear Stearns, signed by Bear Stearns Senior Managing Director, John McDermott. It read as follows:

Reference is made to that certain Distressed Trade (the *"Trade"*) with a trade date of June 27, 2006 between Bear Stearns Investment Products, Inc. (*"Bear"*) and Hitachi Automotive Products (USA), Inc. (*"Hitachi"*), pursuant to which Hitachi agreed to sell to Bear and Bear agreed to purchase from Hitachi approximately $5,721,969.77 of allowable, valid, enforceable non-contingent claims in the Case (the *"Claims"*) against Delphi Automotive Systems LLC (the *"Debtor"*). Reference is farther made to the letter to Bear's counsel dated as of September 12, 2006 from Hitachi's counsel indicating Hitachi's desire to terminate its obligations to close the Trade.

Bear rejects Hitachi's attempt to unilaterally break the Trade.

Bear considers the Trade to be just that—a trade and an obligation of Hitachi to sell the Claim to Bear. In fact, Hitachi's actions since the Trade Date have indicated that Hitachi also believes that it has an obligation to complete the Trade. As you are aware, Bear and its attorneys have been negotiating in good faith the documentation relating to the Trade and the Claims with Hitachi. The parties even met in person to discuss and resolve the specific terms of the Trade. Further, there has [sic] been numerous communications indicating the understanding of both parties that this Trade is a true obligation and not an agreement to try to reach an understanding.

As of last week, only two outstanding points existed with respect to the documentation. On Friday, Bear's counsel received a telephone call from Hitachi's counsel, in which it expressed that, unless Bear was prepared to take the documentation as it had last been presented by Hitachi, Hitachi did not wish to continue to negotiate with Bear. Although Hitachi did not have any basis to unilaterally terminate the trade, Bear immediately wrote to Hitachi, as well as telephoned Hitachi's counsel to inform them that Bear was willing to close on the documentation that had last been presented by Hitachi. Bear remains prepared to do so and demands that Hitachi fulfill its obligations in respect of the Trade and close on this on the terms agreed to.

While we are disappointed at Hitachi's attempt to unilaterally cancel the Trade, we do believe that Hitachi will honor its commitment and proceed towards settlement. Accordingly, we attach the agreed upon Assignment of Claim duly executed by Bear. Please arrange to have the Assignment of Claim executed on behalf of Hitachi. Once Bear receives Hitachi's signatures Bear will wire the purchase price to Hitachi.

If you have any questions, please do not hesitate to contact Laura Torrado at xxx-xxx-xxx.

(Picca Decl. Ex. 32 at H00189–90.) Attached to the letter was copy of Hitachi's August 15 iteration of the Bear Stearns Form, executed on behalf of Bear Stearns. (*Id.* at H00191–205.)

When Bear Stearns had heard nothing from Hitachi by September 18, Evans telephoned Fujimura. (Pls. Rule 56.1 Stmt. ¶ 128.) Again, the parties disagree about exactly what was said during that phone call, but they do agree that Fujimura communicated to Evans that Hitachi viewed the trade as definitively canceled. (*Id.*; Mitchell Decl. Exs. 60; 61.)

On September 21, Ricotta responded by letter to Bear Stearns' September 12 letter. (Mitchell Decl. Ex. 63 at H00207.) Ricotta's letter stated, *inter alia,* that "there was never a complete meeting of the minds of the parties prior to the termi-

nation of all negotiations, which is highlighted by the fact that the Assignment of Claim document enclosed with Mr. McDermott's letter is not signed by Hitachi." (*Id.*)

*Hitachi Sells the Claims to Deutsche Bank*

On September 18, 2006, Hitachi and Deutsche Bank executed two Trade Confirmations for trades dated September 13, 2006, to sell the general, unsecured Claims and the reclamation Claims to Deutsche Bank. (Defs.' Rule 56.1 Stmt. ¶ 121; Picca Decl. Ex. 33.) Deutsche Bank paid 76.5% for the general, unsecured Claims and 85% for the reclamation Claims. (Picca Decl. Ex. 33.)

On October 2, 2006, Hitachi and Deutsche Bank executed Assignment of Claim forms. (Defs.' Rule 56.1 Stmt. ¶ 122; Picca Decl. Ex. 34.) Deutsche Bank agreed to Hitachi's terms regarding "buy back," right to defend in the event of impairment of disallowance, exclusivity of remedy and indemnification. (Defs.' Rule 56.1 Stmt. ¶ 123. Picca Decl. Ex. 34.)

Deutsche Bank filed the necessary paperwork evidencing the trade with the bankruptcy court on October 24, 2006. (Picca Decl. Ex. 35.)

Unaware that Hitachi had sold the Delphi Receivables to Deutsche Bank, Hannon sent Ricotta a letter on October 20, demanding that Hitachi counter-sign the Bear Stearns Form and consummate the trade or face legal proceedings. (Pls.' Rule 56.1 Stmt. 34; Mitchell Decl. Ex. 67 at H00227–28.)

On November 7, Ricotta responded by letter to Hannon's letter, reiterating Hitachi's position that negotiations "were terminated prior to any attempted acceptance of any offer made by Hitachi." (Mitchell Decl. Ex. 68 at H00551–52.) Ricotta stated, *inter alia*, that Hitachi believed it had ended negotiations orally on September 8,

and confirmed that negotiations were over in writing on September 12. He also noted that no signed assignment of claim was received by Hitachi prior to termination. (*Id.*)

Bear Stearns became aware that Hitachi had sold the Delphi Claims to Deutsche Bank in early December 2006 when Evans looked at the docket sheet in the Delphi bankruptcy action. (Pls.' Rule 56.1 Stmt. ¶ 137.)

Hitachi never counter-signed the Bear Stearns Form sent on September 12, 2006, or any other, Bear Stearns Form. (Defs.' Rule 56.1 Stmt. ¶ 119; Pls.' Rule 56.1 Counter–Stmt. ¶ 119.)

No Trade Confirmation was ever signed by either Bear Stearns or Hitachi. (Defs.' Rule 56.1 Stmt. ¶ 120; Pls.' Rule 56.1 Counter–Stmt. ¶ 120.)

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,*

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

The same standard of review applies when the court is faced with cross-motions for summary judgment. *See, e.g., In re Novartis Wage and Hour Litig.,* 06–1794, 2009 WL 63433, at *8 (S.D.N.Y. Jan. 12, 2009). Even when both parties move for summary judgment, claiming the absence of any genuine issues of material fact, a court need not enter judgment for either party. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). Instead, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Bd. of Educ.,* 667 F.2d 305, 314 (2d Cir.1981).

## II. Whether there was a Breach of Contract

Bear Stearns argues that it is entitled to summary judgment on its breach of contract claim because the June 27 telephone call, where the parties agreed on the financial terms of the sale, bound Hitachi to consummate the deal to sell to Bear Stearns the Delphi Claims. The first question is whether an enforceable contract was made at that point.

■■ To establish a breach of contract under New York law a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See, e.g., First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162 (2d Cir.1998). Summary judgment is appropriate, "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 98 (2d Cir.1996) (*quoting Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985); *citing State v. Peerless Ins. Co.,* 108 A.D.2d 385, 390, 489 N.Y.S.2d 213 (1st Dept.1985), *aff'd,* 67 N.Y.2d 845, 501 N.Y.S.2d 651, 492 N.E.2d 779 (1986).)

### A. Whether there was an Implied–in–Fact Contract

Bear Stearns argues that Hitachi breached an implied contract to sell the Delphi Claims. (Pls.' Mot. at 22.)

■ Under New York law, absent a written agreement between the parties, "a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399, 409 (S.D.N.Y.1998) (*quoting Matter of Boice,* 226 A.D.2d 908, 910, 640 N.Y.S.2d 681 (3d Dep't 1996)). An implied-in-fact contract is "just as binding as an express contract arising from de-

clared intention, since in law there is no distinction between agreements made by words and those made by conduct." *Id.* (internal quotations omitted). However, a contract cannot be implied where the facts "are inconsistent with its existence ... or where there is an express contract covering the subject-matter involved, or against the intention or understanding of the parties; or where an express promise would be contrary to law. The assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted." *Id.* (*quoting Miller v. Schloss,* 218 N.Y. 400, 406, 113 N.E. 337(1916)).

Bear Stearns argues that, even though there is no duly executed contract between the parties, considering all circumstances, as of the June 27, there was "mutual assent" on all material terms of the agreement to sell the Delphi Claims. (Pls.' Mot. at 22.) In support of its position, Bear Stearns relies on a single case—*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89 (2d Cir.2007). In that case, AEP Power Marketing ("AEP") and Tractebel Energy Marketing ("Tractebel") executed contract in which AEP promised to provide Tractebel with energy products from a specified source and, in return, Tractebel promised to take a minimum amount of those products and make associated payments at prices stipulated in the contract. *Id.* at 93. Nearly three years later, Tractebel repudiated the contract, arguing, *inter alia,* that the contract was unenforceable because the parties had never been able to agree to an operations protocol that was expressly contemplated in the contract. *Id.* The parties cross moved for summary judgment.

According to Tractebel, the failure of the parties to reach an agreement on the protocol left material terms open in the con-

tract and rendered the agreement an "unenforceable agreement to agree." *Id.* at 94–95. The district court rejected Tractebel's argument, held that the contract was "comprehensive" because it incorporated all material terms of the agreement between the parties and awarded summary judgment to AEP. *Id.* at 95. In particular, the court was impressed by the fact that the parties had set out both conditions precedent and subsequent to the contract's enforceability—none of which was an agreement on the operations protocol. *Id.* at 96.

The Second Circuit upheld the district court's determination that an enforceable contract existed between the parties, noting language in the contract stating that it "constitutes a legally valid and binding obligation." This clearly manifested an intent to be contractually bound. *Id.* at 95–96. The Court of Appeals further held that the contract did not fail for indefiniteness because the contract addressed all material terms of the agreement, including those surrounding the operations protocol, and only left open "non-material details" for future negotiations, such as the exact form of notice to be given by each party in carrying out the protocol. *Id.* at 97. Finally, the Second Circuit found that the parties conduct in the years subsequent to the execution of the contract bolstered the conclusion that the agreement was enforceable. *Id.* For example, Tractebel relied on specific sections of the contract to assert its rights in unrelated negotiations with AEP, and the parties signed a letter agreement in early 2003, which stated "Except to the extent expressly modified by this letter agreement, all other terms and conditions of the [contract] shall remain unmodified and continue in full force and effect." *Id.*

The facts of this case are readily distinguishable from those of *Tractebel.*

In *Tractebel*, AEP sought to enforce a *fully executed*, written agreement that, on its face, contained language specifically binding the parties to the contract. Furthermore, the parties had performed under and relied upon the contractual provisions for *years* prior one party's repudiation. The parties even modified and reaffirmed the terms of their deal *in writing*. Moreover, the Second Circuit found that the provisions left open for further negotiation were mere "details," rather than material terms.

By contrast, here no written contract was ever executed by both parties, nor was there ever any performance under or action taken in reliance on the contract, either by Bear Stearns or by Hitachi. *See, e.g., Apex Oil Co. v. Vanguard Oil & Serv. Co., Inc.*, 760 F.2d 417, 422 (2d Cir.1985). Further, the disputed terms in the trade documents—namely, impairment or buy back, right to defend and indemnification—are clearly not akin to the relatively trivial details left open in *Tractebel* concerning matters like the "form of notice" and "scheduling." *Id. Tractebel*, 487 F.3d at 96.

▮ Additionally, a contract may not be implied-in-fact from the conduct of the parties where it appears that they intended to be fully bound to the ultimate contractual objective only by written documents. *Valentino v. Davis*, 270 A.D.2d 635, 638, 703 N.Y.S.2d 609 (3rd Dep't 2000). Such is the case here. As discussed more fully, *infra*, the trade documents themselves evidenced an intent of the parties to subject a binding agreement on executed documents. For example, Bear Stearns' own Trade Confirmation reads, "This transaction is **subject to** Negotiation, execution and delivery of mutually acceptable contracts and instruments of transfer, including an assignment of claim agreement ('Assignment Agree-

ment') containing customary provisions . . . ." (Picca Decl. Ex. 13) (emphasis supplied). Further the conduct of the parties, engaging in extensive negotiations, and making multiple revisions of the contract documents and having a face-to-face meeting, without ever once performing or demanding performance, exhibits an objective of remaining unbound to the final agreement pending contract execution.

Therefore, Hitachi's motion for summary judgment dismissing Bear Stearns' claim for that implied-in-fact contract exists is granted.

### B. Whether there was a Binding Preliminary Agreement

In the alternative, Bear Stearns argues that Hitachi breached a binding preliminary agreement by failing to consummate the deal to sell the Delphi Claims.

▮ Under New York law, parties are free to enter into a binding contract without committing their agreement to a fully executed writing. *See, e.g., Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir.1985). This is true even if the parties contemplate later evidencing their agreement in a formal, signed document. "In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution." *Id.* (*citing* cases). However, if either party communicates an intention not to be bound absent a fully executed document, then "no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Id.* (*citing R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984)).

### 1. Type I Binding Preliminary Agreement

▮ Two types of binding "preliminary agreements" exist under New York law.

*Tractebel*, 487 F.3d at 98 n. 4. In its moving papers, Bear Stearns does not specify which type of binding preliminary agreement it believes was formed between the parties.

The first type of preliminary agreement ("Type I") is for all practical purposes, a fully formed contract. It "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." *Teachers Ins. and Annuity Assoc. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). Such an agreement is preliminary "in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* In a Type I preliminary agreement "the mere fact that the parties contemplate memorializing their agreement in a more formal document does not prevent their informal agreement from taking effect prior to that event." *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). "A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, despite the anticipation of further formalities, a contract has been reached." *Adjustrite Systems, Inc. v. GAB Bus. Services, Inc.*, 145 F.3d 543, 548 (2d Cir.1998) (internal quotation marks omitted).

To determine whether a Type I binding preliminary agreement exists, courts in this Circuit consider these factors: (a) whether there is an express reservation of the right not to be bound in the absence of a writing; (b) whether there has been partial performance of the contract; (c) whether all of the alleged contract terms have been agreed upon; and (d) whether the agreement is customarily reduced to writing. *See e.g., Brown v. Cara*, 420 F.3d 148, 154 (2d Cir.2005);

*R.G. Group*, 751 F.2d at 75; *Tribune*, 670 F.Supp. at 498. "No single factor is decisive but each provides significant guidance." *R.G. Group*, 751 F.2d at 75.

### a) Whether there is an Express Reservation of the Right not to be Bound in the Absence of a Writing

Whether the parties reserved the right not to be bound absent a writing "is the most important" factor in determining whether a Type I binding preliminary agreement exists. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989). In order to make that determination, courts in this Circuit look to "what the parties said (and/or did)," *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, 04–1621, 2005 WL 1377853, at *6 (S.D.N.Y. 2005) and at "the language of the preliminary agreement for an indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities.'" *Tribune*, 670 F.Supp. at 499. The court will look at all the facts and circumstances during the entire course of the parties' dealings. *Winston*, 777 F.2d at 81–82.

While Evans and Costiniano reached an oral agreement on price, amount and type of Claims, it is undisputed that Bear Stearns and Hitachi wanted their final agreement formalized in writing and made the agreement subject to the negotiation of additional terms. Following the June 27 phone call, the parties embarked on a course of negotiation of the trade documents. On June 27, Evans sent Costiniano and Lim a confirmatory e-mail, in which she wrote that she would have Bear Stearns' "lawyers start drafting the trade confirm and assignment of claim." (Picca Decl. Ex. 12.) That same day Bear Stearns faxed two trade confirmations to Hitachi to be executed by the parties. (*Id.* Ex. 13.) Also on June 27, Lim sent Evans

the Hitachi mark up of the Bear Stearns Form and three days later provided its comments to the Trade Confirmations. (*Id.* Ex. 16; 17.) Bear Stearns then responded with counter-proposals to each document. (*Id.* Ex. 18, 19.) Additionally, the parties met face-to-face on August 9 to address open issues with the trade documents. (*Id.* Ex. 20.)

■■■ "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Cara,* 420 F.3d at 153 (*quoting Adjustrite,* 145 F.3d at 548). Further, negotiating "numerous" contract drafts after reaching a preliminary agreement on some terms has been held by the Second Circuit as strong evidence that the parties intended to remain unbound pending the execution of formal documentation. *See, e.g. Reprosys., B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.1984).

Moreover, the trade documents themselves are indicative of an intent to subject consummation of the deal on signed contracts. As discussed *supra,* the Trade Confirmation on its face contemplates the execution of formal documentation as a condition precedent to the trade taking formal effect. The document reads, "This transaction is **subject to** Negotiation, execution and delivery of mutually acceptable contracts and instruments of transfer, including an assignment of claim agreement ('Assignment Agreement') containing customary provisions ...." (Picca Decl. Ex. 13) (emphasis supplied). Additionally, the payment of money for the Claims was conditioned on the execution of the Bear Stearns Form, which states "Assignee [Bear Stearns] shall pay Purchase Price on the date hereof." (Picca Decl. Ex. 9.) Withholding payment until the execution of the formal document suggests that the parties intended not to be fully bound until

they executed a formal writing. *See, e.g., Winston,* 777 F.2d at 82. "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future participation and execution of contract documents." *Tribune,* 670 F.Supp. at 499.

The record evidence weighs strongly in favor of Hitachi's interpretation that the parties' intention was to reserve their right to be bound to the "ultimate contractual objective" pending execution of formal documents.

### b) Whether there has been Partial Performance of the Contract

■■■ "Aside from unilateral contracts, partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group.,* 751 F.2d at 75–76. Performing under the terms of the agreement would be "strong circumstantial proof that the minds of the parties had met on the essential elements ..." *Viacom Int'l, Inc. v. Tandem Prod., Inc.,* 368 F.Supp. 1264, 1270 (S.D.N.Y.1974).

In this case, the putative agreement called for the paying of consideration in exchange for ownership of Delphi Claims. Neither of those things happened. Bear Stearns argues—albeit only in a footnote—that the fact that Hitachi stopped soliciting bids from other parties after it accepted Bear Stearns' bid during the June 27 phone call amounts to partial performance of the final agreement. (Pls.' Mot. at 26 n. 15.) Bear Stearns has not submitted any case law in support of its position that refraining from accepting competing bids amounts to partial performance of a contract to sell bankruptcy receivables for

money, and this Court sees no merit in the idea.

So this factor, too, weighs in favor of a finding that no Type I binding preliminary agreement existed.

### c) Whether All of the Alleged Contract Terms have been Agreed upon

██ There can be no fully formed, binding contract where material terms remain to be negotiated. *See, e.g., Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 325 (2d Cir.1997).

Bear Stearns argues that, as of June 27, the totality of the circumstances demonstrates that there was mutual assent on all material terms of the agreement as evidenced by (i) the fact that Hitachi had the Bear Stearns Form in its possession since May 31, and did not object to or raise concerns about its provisions until after the phone agreement and (ii) Hitachi's behavior subsequent to the phone agreement demonstrates that it too believed all material terms were agreed upon as of June 27. But these arguments do not persuade me that the parties reached a binding Type I preliminary agreement on June 27.

*First,* the fact that Hitachi did not raise concerns about the Bear Stearns Form with Bear Stearns until after the parties agreed on the financial terms does not necessarily mean that Hitachi's disagreement over certain terms in the Bear Stearns Form were immaterial. There is evidence in the record that the May 31 Bear Stearns Form was advertised as a "standard" when it was transmitted to Hitachi. Indeed, Evans wrote in her e-mail transmitting the document "Attached is **our standard** Assignment of Claim form.... We hope to work with Hitachi to reach an agreement that both parties are comfortable with .... Once we receive all the necessary documents we can draft a Trade Confirmation." (Picca Decl. Ex. 9)

(emphasis supplied). Given Evans' language about "hoping to work with Hitachi to reach an agreement that both parties are comfortable with," it strains credulity for Bear Stearns to argue that Hitachi should have understood that the Form was being presented as an execution-ready document. Evans' e-mail could have been interpreted (and might more readily be interpreted) to mean that the Bear Stearns From was being provided as a template only, and that there would be further negotiating over the trade documents prior to consummating the deal. Nowhere in Evans' e-mail did she inform Hitachi that it must provide comments to the Bear Stearns Form prior to an agreement to price—or any other material term—if it wanted terms different than those set forth in the May 31 Bear Stearns Form to control.

Additionally, the text of the Trade Confirmation undermines Bear Stearns' argument that Hitachi was required to raise any objection to the Bear Stearns Form prior to the agreement on price, amount and type of Claims or be held to the Bear Stearns Form. As previously discussed, the trade confirmation, specifically states that the transaction is "subject to" the execution of formal documentation. In light of the language in Bear Stearns' own trade confirmation, which specifically contemplates the negotiation of trade contracts *after* the oral trade agreement, it is unpersuasive for Bear Stearns to argue that Hitachi waived its right to object to the terms of the trade documents by failing to raise its concerns *before* the parties had orally agreed to the trade.

Bear Stearns also argues that, as of June 27, there was a true meeting of the minds on all material terms—including those in the Bear Stearns Form—and that it was only when Hitachi learned of Delphi's possible preference action in July

that it began to push back on the buy back provision. Hitachi responds that Bear Stearns' argument is undermined by the fact that Hitachi's stance on these issues remained consistent from its first set of changes to the Bear Stearns Form, which it sent on June 27. (Defs.' Rule 56.1 Counter–Stmt. ¶ 89.) Hitachi is correct—even in Hitachi's June 27 iteration of the Bear Form, Hitachi revised the buy back section such that Bear Stearns could only seek repayment for the claims in the event that an objection to the Claims was upheld by a *final* order of the bankruptcy court and made the buy back Bear Stearns sole and exclusive remedy. (*Id.* ¶, 89, 90.) Hitachi's position on these points did not change throughout the negotiations. (*See, e.g.,* Picca Decl. Ex. 17; 18.) In light of the consistency of Hitachi's position, even if the preference action were of concern to Hitachi, Bear Stearns has not shown that it altered Hitachi's stance on the provisions in the trade documents after June 27 to raise an inference that there was a complete meeting of the minds, disrupted only by the specter of the preference action.

*Second,* while it is true that "the existence of a contract may be established through the conduct of the parties recognizing the contract," *Apex Oil,* 760 F.2d at 422, Hitachi's behavior following June 27, does not suggest that the parties had a fully formed, binding agreement. After the June 27 phone call, in which some terms were agreed, Hitachi almost immediately sent comments to Bear Stearns about the Bear Stearns Form, including substantive edits to the provisions covering repayment or buy back, indemnification and the right to defend the Claims. (*See* Picca Decl. Ex. 16.) Just three days later, on June 30, Hitachi also provided comments to the Bear Stearns' Trade Confirmation, which included considerable word changes and deletions. (*See* Picca Decl.

Ex. 17.) If the parties had made a fully binding agreement on June 27, there would have been no reason for Hitachi to negotiate with Bear Stearns over the trade documents—or, more tellingly, for Bear Stearns to negotiate with Hitachi.

The Second Circuit has held that a disputed contractual provision is material when specific terms of the putative contract go through multiple drafts:

> Where, as here, counsel insist on continually redrafting the specific terms of a proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution and consummation of the agreement. Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Winston,* 777 F.2d at 82–83.

This factor too, therefore, weighs against a finding of a Type I binding preliminary agreement.

### d) Whether Such Agreement is Customarily Reduced to Writing

"[W]hether the agreement at issue is the type of contract that usually committed to writing" is also relevant to whether a binding preliminary agreement exists. *Winston,* 777 F.2d at 80. Hitachi argues that trades for bankruptcy claims are never

consummated without executed, written documents. (Defs. Opp'n at 12.) Hitachi points to the words of the trade confirmation itself, as well as, the fact that even Bear Stearns own witnesses admitted that some sort of writing always formalized the oral trade transaction. (*See, e.g.,* Picca Decl. Ex. 5; Torrado Malley Dep. Tr. 89:15–90:5.) In *R.G. Group*, the court, evaluating whether a Type I binding preliminary agreement existed, considered (i) the complexity of the transaction; the (ii) the length of the contract; and (iii) and the amount of money at stake. 751 F.2d at 77.

Bear Stearns' expert, Scott Esbin ("Esbin"), an attorney who has "actively represented buyers and sellers of bankruptcy trade claims" since 1990, submitted a report in which he opined about the customs of the claims trading industry. (Mitchell Decl. Ex. 73 at 3.) According to Esbin, in the trade claim market, the parties to a purchase and sale of a bankruptcy trade claim "understand" that the sale is made upon the "Trade Date," the date upon which the parties agree to the material terms of the transaction, which Esbin defines as (i) who the parties are; (ii) the name of the debtor owing payment on the claim; (iii) the type of claim being purchased (e.g. secured or unsecured); and (iv) amount of claim. (*Id.* at 4.) If the those terms are agreed to by telephone, "the existence of the deal may be (and often is) supported by a taped recording of the call, contemporaneous notations on a trader's book or blotter or some other evidence sufficient to support the evidence of the trade . . ." (*Id.*) The trade confirmation, according to Esbin, "while preferable, is not a precondition to the formation of a binding trade." (*Id.*) Once an agreement has been reached on the financial terms, the parties will then undergo a period of due diligence and negotiation, followed by the execution of the assignment of claim form and an "evidence of transfer" to be filed with the bankruptcy court. (*Id.* at 5.) According to Esbin, unless the parties specifically agree otherwise on the Trade Date, the "customary industry standards for the purchase and sale of trade claims guide the drafting of definitive documentation." (*Id.* at 6.)

Esbin's report does not contradict Hitachi's contention that trades are ordinarily not consummated until documents are signed. The testimony of Bear Stearns witnesses is to the same effect. Not a single witness testified that *no* formal writing is necessary to consummate a bankruptcy claim trade. Both Esbin and Torrado testified that an assignment of claim form is *always* executed in connection with such transactions. (Mitchell Decl. Ex. 73 at 5–6; Picca Decl. Ex. 5, Torrado Malley Dep. Tr. 89:21–90:5.) Further, the putative agreement between Hitachi and Bear Stearns involved the sale of over $7.4 million dollars in accounts receivable and included negotiation and preparation of two separate legal documents—the Assignment of Claim and the Trade Confirmation. The amount of money at stake and the complexity of the transaction make it highly improbable that parties would rely solely on oral agreements, finding it unnecessary to reduce their understanding to a formal document. *See, e.g., R.G. Group,* 751 F.2d at 77.

#### e) *Angelo Gordon*

The foregoing factors were recently applied by a court in this District considering whether a Type I preliminary agreement existed for the sale of bankruptcy receivables. *Angelo Gordon & Co., L.P. v. Dycom Indus., Inc.,* 04–1570, 2006 WL 870453, at *1 (S.D.N.Y. March 31, 2006). As the facts of *Angelo Gordon* are similar to those presented here, reciting them in some detail is instructive.

Angelo Gordon & Co., L.P. ("Angelo Gordon"), an entity "engaged in the business of buying and selling ... claims against or loans to companies in financial distress" brought a breach of contract action against Dycom Industries, Inc. ("Dycom") based on an alleged breach of its agreement to sell to Angelo Gordon claims against several corporations and limited liability companies indirectly or wholly-owned by Adelphia Communications (the "Adelphia Claims"). *Id.* at *2. Dycom engaged the investment bank Morgan Stanley to represent its interests in selling the Adelphia Claims. It then entered into negotiations with Angelo Gordon. *Id.* at *2. After several months of on-and-off negotiations, Morgan Stanley attempted to broker a deal between the two parties. *Id.* at *3. After several oral conversations, a Morgan Stanley representative wrote an e-mail to the CFO of Dycom confirming the financial terms of the sale of the Adelphia Claims. *Id.* The e-mail noted that the deal was "subject to the execution of customary documentation" and at the bottom of the e-mail was disclaimer language, indicating that it should not be taken as an offer to buy or sell securities. *Id.* at *4. The Dycom CFO responded to the e-mail, "This is okay." *Id.*

Angelo Gordon's counsel then e-mailed Dycom a transfer of claim agreement, which stated that Angelo Gordon's obligation to pay for the claims was conditioned on the receipt of the claim agreement executed by Dycom. *Id.* at *5. Dycom responded with a mark up to the claim agreement, noting that the provisions surrounding the mechanics' liens and the impairment (or buy back) clauses were unacceptable to it. *Id.* Angelo Gordon wrote back with a draft that incorporated some, but not all, of Dycom's changes. *Id.* at *6. Some weeks later Dycom received an unsolicited offer to purchase the Adelphia Claims from Can-

yon Capital Advisors ("Canyon") at a more favorable rate than the one offered by Angelo Gordon. *Id.* Dycom sold the Adelphia Claims to Canyon for the offered price and under the terms Dycom had desired from Angelo Gordon. *Id.*

Following a bench trial, Judge Berman of this Court applied the four factors discussed above and found that no Type I binding preliminary agreement existed between Angelo Gordon and Dycom. *Id.* at *1, 7. Judge Berman found that the explicit statements in the parties' e-mails and trade documents that the agreement was "subject to" the execution of written documentation as well as the disclaimer language in the e-mails demonstrated an intent not to be bound to the "ultimate objective of selling the claims" absent a writing. *Id.* at *8. The Court was also persuaded that the negotiations over the draft trade documents revealed a lack of agreement on material terms of the contract. *Id.* at *9–10. Specifically, Judge Berman found, that "The never-finalized negotiations over the mechanics' liens and/or the impairment [buy back] clause indicates that the parties did not agree." *Id.* at *10. Finally, despite conflicting evidence from the parties on industry custom, Judge Berman found that Angelo Gordon "failed to meet its burden [the preponderance of the evidence] of proving that the distressed debt market considers agreements binding based solely on phone conversations and e-mails." *Id.* at *11. Judge Berman also noted that even if there were such a custom, Angelo Gordon failed to show that Dycom knew of it. *Id.*

Bear Stearns argues that Angelo Gordon is distinguishable from this case because (i) Dycom, unlike Hitachi, did not have a copy of the agreement containing all the contractual terms a nearly a month before reaching an agreement on financial terms; (ii) Dycom, unlike Hitachi, through

its GM/Delphi Team, did not perform "exhaustive due diligence" on the custom and practice of the claims trading industry; and (iii) Dycom, unlike Hitachi, did not consult with outside counsel before forming an agreement. (Pls.' Mot. at 27.) I find none of these distinctions to be material since, *inter alia*, the Bear Stearns Form was presented to Hitachi as a "standard" and Dycom retained investment bank Morgan Stanley to assist it with the potential sale of the Delphi Claims.

In this case, where the material facts are not in dispute, Judge Berman's reasoning is persuasive. Application of the four factors discussed above favors Hitachi's position that no Type I preliminary agreement was reached on June 27. In particular, the extensive negotiations over the impairment or buyback provision, indemnification and the right to defend claims from the day the oral agreement was struck and the language of the trade documents themselves demonstrates an intent to condition a fully formed contract on the execution of formal documents.

Bear Stearns also argues that the Court's analysis should be guided, not by *Angelo Gordon*, but by the decision in *Bear Stearns Bank, PLC v. Forum Global Equity, Ltd.*, a case decided by the High Court of Justice Queen's Bench Division in England. (Mitchell Decl. Ex. 71.) The English Court did not apply New York law, however, so it is far less persuasive than *Angelo Gordon*.

I therefore grant Hitachi's motion for summary judgment dismissing Bear Stearns' claim that there was a breach of a Type 1 binding preliminary agreement because no such agreement existed.

### 3. A Type II Binding Preliminary Agreement

The second type of preliminary agreement ("Type II") is "one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated .... the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach a final agreement within the scope that has been settled in the preliminary agreement." *Tribune*, 670 F.Supp. at 498. But while a party to a Type I preliminary agreement may demand performance of the transaction even if "no further steps have been taken following the making of the 'preliminary' agreement," a party to a Type II preliminary agreement "may not." *Id.* A party to a Type II preliminary agreement may only demand that "his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms." *Id.* This "does not guarantee" that a final contract will result. *Id.* But, "The obligation of a Type II preliminary agreement *does* bar a party from renouncing the deal, abandoning the negotiations, or insisting the conditions do not conform to the preliminary agreement." *Id.* (emphasis supplied).

Recognition of binding Type II agreements plots a middle course between competing policy concerns. It avoids of "trapping parties in surprise contractual obligations that they never intended" on the one hand, and "en force[ment] and preserve[ation of] agreements that were intended as binding, despite the need for further documentation or further negotiation" on the other. *Cara*, 420 F.3d at 156–57 (*quoting Tribune*, 670 F.Supp. at 497). The rationale behind giving binding force to such preliminary agreements has been stated as follows:

> Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace, particularly

for relatively standardized transactions like loans. It permits borrowers and lenders to make plans in reliance upon their preliminary agreements and present market conditions. Without such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms.

*Tribune,* 670 F.Supp. at 499.

The Second Circuit defines the relevant factors to be considered in determining whether a Type II binding preliminary agreement as: (a) whether the intent to be bound is revealed by the language of the agreement; (b) the context of the negotiations; (c) the existence of open terms; (d) partial performance; and (e) the necessity of putting the agreement in final form, as indicated by the customary form of such transaction. *Cara,* 420 F.3d at 157. These factors hew closely to those applied to test whether a Type I preliminary agreement exists, but they "have a somewhat different significance where . . . the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms." *Tribune,* 670 F.Supp. at 499. Put another way, if the question is whether the parties bound themselves to negotiate in good faith towards a mutual contractual end, then "the language of the agreement, its contents and omissions, and the context in which in was negotiated and signed, may lead to different conclusions." *Cara,* 420 F.3d at 157.

### a) Whether the Intent to be Bound is Revealed by the Language of the Agreement

In this case, the preliminary agreement over financial terms occurred in a trade phone conversation, and the parties to the call dispute what was said. There is no record of a transcript or a recording of the conversation, and no one has produced contemporaneous notes, all of which Esbin said are used to document oral trade agreements. (Mitchell Decl. Ex. 73 at 4.) During her deposition, Evans testified that during the phone call Bear Stearns made a firm bid for the Delphi claims, Hitachi accepted that bid, the parties agreed to the amount and type of Claims, and they had "come to an agreement that we have a transaction." (Picca Decl. Ex. 10, Evans Dep. Tr. 85:7–12.) Costiniano testified that he and Evans agreed that there would be "documents that needed to be completed" (Picca Decl. Ex. 6, Costiniano Dep. Tr. 340:4–7)—which is confirmed by the text of the documents themselves.

The fact that documents needed to be completed does not eliminate the possibility that the parties agreed to be bound by the "general framework" of the deal struck on the June 27 phone call. *See e.g., Cara,* 420 F.3d at 158. Unlike Type I binding preliminary agreements, "Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party." *Tribune,* 670 F.Supp. at 500. The question is better framed as whether "there was a mutual intent to be bound to a preliminary commitment" which "required further steps." *Id.* In this inquiry such terms of reservation, are "by no means incompatible with intention to be bound." *Id.* Further, if under all of the circumstances, it appears that there was an intention by both parties to be bound, "the presence of such reservations does not free a party to walk away from a deaf merely because it later decides that the deal is not in its interest." *Id.* That inqui-

ry is addressed in consideration of the other four factors.

### b) The Context of the Negotiations

The next factor is whether the context of the negotiations demonstrates an intent of the parties to be bound by a preliminary commitment to negotiate the terms of their final agreement in good faith. Bear Stearns points out that, after June 27, Hitachi: (i) accepted and, indeed was pleased with, Bear Stearns' bid (Mitchell Decl. Ex. 11, Lim e-mail with subject "Bear Wins"; Mitchell Decl. Ex. 13; 15); (ii) ceased marketing the receivables to third parties (Mitchell Decl. Ex. 19) and (iii) directed Ricotta to stop reviewing additional proposals (Mitchell Decl. Ex. 11). Bear Stearns also highlights that after Evans wrote, in no uncertain terms, that it was Bear Stearns' position the June 27 terms were binding, (Mitchell Decl. Ex. 17), Hitachi not only never challenged that assertion, but Fujimura of Hitachi took the same position. In response to Evans' e-mail, Fujimura wrote in an internal e-mail to members of the GM/Delphi Team, "Please go ahead with Bear Stearns under the current agreement we reached.... We reached agreement through June 27 meeting (Japan time) to appoint Bear Stearns ... We should not accept any better bids from unappointed entity after the deadline, even if the changed rate seems more attractive." (Mitchell Decl. Ex. 19 at H02815.) Fujimura's e-mail expresses an understanding that the June 27 phone call represented a commitment by the parties to negotiate the terms of a sale, despite market fluctuations.

This factor, therefore, weighs in favor of a finding that a Type II binding preliminary agreement existed between the parties as of June 27.

### c) The Existence of Open Terms

"[W]here the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, these same omissions may actually support finding a binding Type II agreement." *Cara*, 420 F.3d at 158 (internal citations omitted); *see also Tribune*, 670 F.Supp. at 499. The relevant question is whether the preliminary agreement bound the parties to negotiate such open terms in good faith. *Id.* at 502. The very fact that the parties undertook significant negotiations of additional contractual terms left undecided by the initial agreement supports a finding that the parties considered the initial agreement to bind them to take further steps to complete the final contract in good faith.

As discussed above, after June 27, the parties continued to negotiate several open terms in the trade documents, including the impairment or buy back clause, right to defend the Claims and indemnification. However, the negotiation of these open terms does not warrant a finding against Bear Stearns on the issue of a Type II agreement. In light of the fluctuations of the bankruptcy trade claim market, it makes sense to allow parties to strike oral agreements on a basic frame work for the deal, and then hammer out specific terms. *See, e.g., Cara*, 420 F.3d 148 at 158; *Tribune*, 670 F.Supp. at 499. This does not, of course, guarantee the consummation of any deal, it but allows parties to rely upon a preliminary commitment during the deal negotiation process.

### d) Partial Performance

As discussed above, there was no partial performance of the putative contract. However, in considering whether a Type II binding preliminary agreement existed, the court in *Tribune* noted that it had not

"attached great importance" to this factor. 670 F.Supp. at 502.

### e) The Necessity of Putting the Agreement in Final Form, as Indicated by the Customary Form of Such Transaction

■ As discussed *supra*, it, of course, makes sense that multi-million dollar transactions would ultimately be committed to a formal writing—especially since the trade must be evidenced with the bankruptcy court. This is not, however, the determinative inquiry for whether a Type II binding preliminary agreement has been reached. In this context, the inquiry is more pointedly "whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue." *Tribune,* 670 F.Supp. at 503.

Esbin testified at his deposition that "Among the customs [in the trade claims industry] ... are once the parties agree to a transaction, they're duty bound to negotiate in good faith toward consummation of the transaction...." (Pls.' Dep. Excerpts Ex. 2, Esbin Dep. Tr. 32:2–5.) He also submitted in his expert report that it is industry custom for a party to an oral trade agreement to give written notice to its counterparty that the transaction is at an "impasse" and that it intends to terminate. (Mitchell Deck Ex. 73 at 7.) This notice would typically provide for a period of time for the parties to conclude the transaction or consider it terminated. (*Id.*) In Esbin's experience the period was never less than five business days. (*Id.*)

Esbin's testimony on these points is uncontroverted. Hitachi argues that Bear Stearns' own witnesses testified that these industry customs are not written down any where and cannot be verified independently. (*see, e.g.,* Picca Decl. Ex. 5, Torrado Malley Dep. Tr. 79:17–19.) Accordingly,

Hitachi contends that, even if such industry customs exist, because Hitachi is not a member of the claims trading industry, its subjective belief "that any agreement with Bear Stearns required a writing to be binding and there was no oral agreement on the terms of the documentation" is relevant to whether a binding preliminary agreement was formed. (Defs.' Mot at 23–24; Lim Decl. ¶¶ 8, 9.) Relying on Judge Berman's opinion in *Angelo Gordon*, Hitachi's position is that, as a novice in the claims trading industry, it cannot be charged with knowledge of its alleged customs and practices. (Defs.' Mot. at 24.) Bear Stearns counters that after the GM/Delphi Team performed extensive diligence into the claims trading industry, Hitachi cannot claim ignorance of industry custom. (Pls.' Reply at 7–8.)

I agree that Hitachi has raised a question about whether it knew of the industry customs about which Esbin testified. But that does not create a genuine issue of fact because other evidence in the record (discussed above, *see* pp. 625–26) demonstrates that Hitachi viewed the June 27 call as creating a binding commitment to work in good faith towards the sale of the Delphi Claims. (*See, e.g.,* Mitchell Decl. Ex. 19 at H02815.) In light of that evidence, and the fact that Esbin's testimony concerning the custom of the claims trading industry is unchallenged, Hitachi's alleged ignorance of industry custom does not bar a finding that a Type II agreement existed.

Applying the five factor test, I am persuaded that Bear Stearns and Hitachi entered into a Type II preliminary agreement during the June 27 phone call and I grant Bear Stearns' motion for summary judgment to that extent.

■ Hitachi argues that any binding preliminary agreement would be unenforceable under New York's Statute of Frauds. (*See, e.g.,* Hitachi Reply at 7–8.)

**628**

This argument is without merit because certain "qualified financial contracts"—including the "assignment, sale, trade, participation or exchange of indebtedness or claims relating thereto arising in the course of the claimant's business or profession (including, but not limited to commercial and/or bank loans, choses in action arising under or in connection with loan agreements and private notes, and including forward sales) . . ."—are exempt from the Statute of Frauds under New York law. N.Y. Gen. Obl. L. § 5–701b(2)(i) (West 2009). Hitachi argues that trade claims are not exempt because they are not among the enumerated examples in the statute. But the Statute expressly provides that the list examples are not exclusive. (*Id.*) The agreement to sell the Delphi Claims is a sale of indebtedness, and so does not implicate the Statute of Frauds under New York law.

■ The fact that an enforceable Type II agreement existed does not, of course, mean that Hitachi was firmly obligated to sell the Delphi Claims to Bear Stearns. For that reason, I must deny both parties' motions for summary judgment on the issue of whether there was a breach of a Type II preliminary agreement. Bear Stearns only had a right to demand that Hitachi negotiate the terms of the sale in good faith. I cannot say that either side is entitled to summary judgment on that issue. The question for trial is therefore, whether Hitachi breached its obligation of good faith by secretly re-marketing the Delphi Claims and selling them to Deutsche Bank while it was still engaged in talks with Bear Stearns. If there was a breach, damages will have to be ascertained.

### III. Whether Hitachi Acted in Bad Faith

Bear Stearns has also moved for summary judgment on its claim that Hitachi breached its obligation of good faith and fair dealing. (Pls.' Mot. at 27.) Hitachi cross moves for dismissal of the claim. I grant Hitachi's motion.

■ Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance. *Tractebel*, 487 F.3d at 98 (*citing Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)). The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (internal quotation marks and citations omitted). Further, the covenant may take the form of a requirement that a party take "affirmative steps to cooperate in achieving" the contract's purpose. *Tractebel*, 487 F.3d at 98 (*quoting* Farnsworth on Contracts § 7.17 (2d ed.2001)).

■ "[C]laims for breach of good faith and fair dealing do not state an independent cause of action." *Silvester v. Time Warner, Inc.*, 1 Misc.3d 250, 763 N.Y.S.2d 912, 918 (2003) A party's obligation under the covenant of good faith and fair dealing is derivative of its contractual obligations and "such covenant does not impose any obligation upon a party to the contract beyond what the explicit terms of the contract provide." *Id.* (internal citations omitted).

■ Bear Stearns' breach of the covenant of good faith and fair dealing is duplicative of its breach of contract claim and therefore does not state a viable cause of action under New York law. *See, e.g.,* *Apfel v. Prudential–Bache Sec., Inc.*, 183 A.D.2d 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992); *MDC Corp., Inc. v. John H. Harlan Co.*, 228 F.Supp.2d 387, 395

(S.D.N.Y.2002). Hitachi's motion for summary judgment dismissing this claim is granted.

The case is set for trial on July 13, 2009. The final pre-trial conference will be held on June 19, 2009. The parties should modify the pre-trial order to reflect the rulings made in this decision and resubmit it by May 1, 2009. In limine motions are due on May 1, 2009; responses to in limine motions on May 18, 2009. The Court does not accept replies on in limine motions. All in limine motions will be decided at the final pre-trial conference on June 19, 2009. All objections to exhibits will be ruled on at the final pre-trial conference. Counsel shall come prepared.

This constitutes the decision and order of this Court.